## CABANA *v.* CITY OF HART.

1. APPEAL AND ERROR—WITNESSES—ELECTRICITY—QUALIFICATIONS OF EXPERT.

Failure to sustain defendant city's motion to strike out answers first made by witness before he had made statements establishing his qualifications to testify as a witness on the subject of whether or not defendant's electric lamp post had been properly safeguarded or maintained because of failure to provide a proper ground therefor, was at most harmless error in view of statements finally made as to qualifications indicating the scope of his knowledge on the matter that were not followed by motion to strike.

2. SAME—QUESTIONS REVIEWABLE—PLEADING—SAVING QUESTION FOR REVIEW.

Objection to admission of testimony, not having been made at the trial on the ground that declaration did not specifi-

REFERENCES FOR POINTS IN HEADNOTES

[2, 6] 3 Am Jur, Appeal and Error, §§ 246, 343.
[8] 38 Am Jur, Municipal Corporations, § 585.
[9] 18 Am Jur, Electricity, § 57.
[10] 3 Am Jur, Appeal and Error, § 947.
[11] 18 Am Jur, Electricity, § 120.

cally aver negligence by failure to safeguard and maintain electric lamp post by having it properly grounded, came too late when made for the first time on appeal.

3. DEATH—ELECTROCUTION—EXPERT WITNESS.

In action under death act by administratrix of electrocuted boy's estate against city where facts of electrocution, that defendant's lamp post was charged with electricity and that the current had passed through decedent's body were not disputed, it was not error to ask expert witness what would have caused the electrocution of the boy, where his answer indicated that he understood an explanation was sought and not his opinion as to whether the electrocution was the result of defendant's negligence and defendant's superintendent had previously given similar testimony without objection (CL 1948, § 691.581 *et seq.*).

4. WITNESSES—ELECTRICITY—MUNICIPAL LAMP POST.

Testimony of expert witness, a graduate electrical engineer, which assumed that defendant city's lamp post, against which plaintiff's decedent had placed his hands and been electrocuted, had not been properly grounded was admissible, where there was proof that it should have been properly grounded and that there was an absence of probability of efficient grounding as shown by the condition of defendant's system in general and this lamp post in particular.

5. DEATH—DAMAGES—EARNING CAPACITY OF MINOR BOY.

In action by administratrix of estate of 16-year-old boy who was electrocuted when he placed his hands on defendant city's electric lamp post, the admission of testimony of one witness on question of earning capacity of decedent that the hourly wages paid by him were the usual wages paid in the community was not error, where other witnesses testified without objection as to wages paid by them for farm labor.

6. APPEAL AND ERROR—ADMISSION OF TESTIMONY—SAVING QUESTION FOR REVIEW.

On appeal a party may not question admission of testimony received without objection.

7. DEATH—DAMAGES—EARNING CAPACITY—EVIDENCE.

Judgment of $5,000 after remittitur from verdict of $7,483.63 was not excessive in action by administratrix of estate of 16-year-old electrocuted boy who had been in good health and was industrious, where evidence shows farm laborers

received from $1 to $1.50 an hour and bean and pickle harvesters received from $8 to $12 per day.

8. MUNICIPAL CORPORATIONS—MAINTENANCE OF STREETS IN A SAFE CONDITION.

The statute imposing upon a municipality the obligation to maintain its streets, highways and sidewalks in a reasonably safe condition for public travel abrogated the common-law exception from liability for the exercise of a governmental function (CL 1948, §§ 242.1, 242.3, 242.5, 242.6).

9. SAME—ELECTRIC LAMP POSTS—DEFECTIVE INSTALLATION.

Defendant municipality would be charged with notice of fact of defective installation if its installation of an electric lamp post in the public sidewalk were defective, under statute removing exemption from liability because of the exercise of a governmental function (CL 1948, §§ 242.1, 242.3, 242.5, 242.6).

10. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.

Testimony must be construed as strongly as possible in favor of plaintiff on defendant's appeal from denial of its motion for a directed verdict.

11. MUNICIPAL CORPORATIONS—STREET-LIGHTING SYSTEM—NEGLIGENCE—NOTICE OF DEFECT—QUESTION FOR JURY.

In action by administratrix of estate of 16-year-old boy who had been electrocuted when he placed his hands on defendant's electric lamp post, evidence justified submitting question of defendant's negligence and its knowledge or notice of the condition of the post to jury where plaintiff's proofs tended to show that defendant's street-lighting system had been in operation for many years, that wires within the posts were only inspected when trouble therein developed, that electric wiring deteriorated with age especially on exposure to moisture, that post was not suitably protected against moisture at the base, was not adequately grounded, was so located in center of sidewalk that it was a menace to people and that defendant's employees had discovered such a situation existed with reference to other posts in the system (CL 1948, §§ 242.1, 242.3, 242.5, 242.6).

Appeal from Oceana; Pugsley (Earl C.), J. Submitted January 4, 1950. (Docket No. 26, Calendar No. 44,569.) Decided April 3, 1950.

Case by Bessie Cabana, as administratrix of the estate of Clarence Dale Cabana, deceased, for damages sustained as result of his death by electrocution when he touched one of defendant's lamp posts. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Campbell & Campbell,* for plaintiff.

*Mitts & Smith,* for defendant.

CARR, J. Plaintiff's decedent was killed as the result of coming in contact with a lamp post maintained by the defendant municipality as a part of its street-lighting system. The accident happened at approximately 1 o'clock in the morning on October 27, 1946. Clarence Cabana, a young man 16 years of age at the time, was in Hart accompanied by a friend of about his own age. For some reason he laid his hands on the post in question, which evidently was charged with electricity. Death was instantaneous, or practically so.

The post was hollow, of metal construction, either steel or cast iron, was approximately 8 feet in height, and was set in the sidewalk on the south side of Washington street in proximity to a hotel. It was fastened to the cement by means of bolts. An opening at the base of the post permitted access for the purpose of detaching the post from the base. Such opening was designed to be covered by a metal plate, which was off at the time of the accident and prior thereto, thus permitting moisture to enter the post. The electric wires were carried through the streets, from post to post, by underground conduits, and extended in each post to the light at the top.

Plaintiff brought this action under the provisions of the death act of the State as amended by PA 1939, No 297 (CL 1948, § 691.581 *et seq.* [Stat Ann

1949 Cum Supp § 27.711 *et seq.*]). The declaration alleged that it was the duty of the defendant to have the metallic post in question properly safeguarded, to maintain all parts of the street-lighting system in a reasonable state of repair, to make inspections of the installations, and to replace all wires and other parts found defective. It was further averred that the post with which plaintiff's decedent came in contact was not properly maintained, that the fastenings at the lower end of the post had become worn and out of repair, that it was insecurely connected with the base, and that it was not properly protected against the flowage of electric current. It was the claim of plaintiff that the electrocution of her decedent resulted from the failure of defendant to properly safeguard and maintain the metal lamp post in question, and the wires therein. Defendant by answer denied negligence on its part, and alleged further by way of affirmative defense that in the operation of its street-lighting system it was engaged in the performance of a governmental function and therefore immune from liability because of negligence on the part of its agents or employees.

During the trial before a jury in circuit court counsel for defendant moved for a directed verdict, claiming that no negligence on the part of the municipality was shown by plaintiff's proofs, and that notice or knowledge of the alleged defective condition had not been established. Said motion was renewed at the end of the proofs and was taken under advisement by the trial judge. The case was submitted to the jury under a charge that there could be no recovery unless plaintiff had established a breach, on the part of defendant, of its statutory duty to maintain its streets and sidewalks in a condition reasonably safe for public travel. The following excerpt from the charge clearly indicates the theory of the plaintiff's alleged cause of action:

"Now, as we apply that statute and that expression of law which I have just read to you to the facts in this case, it means that on the 26th of October or the early morning of October 27th, that it was the duty of the village of Hart to keep in reasonable repair so that the same should be reasonably safe and convenient for public travel the sidewalk at the particular place where this pole stood. And if this pole as it then and there existed and stood at the time of the accident was a dangerous instrumentality and as such known to be that by the city or village, then there follows an act of negligence upon which liability can be predicated. But if there was no knowledge on the part of the city of the danger existing in that pole, then the city cannot be held liable unless you find in addition to its lack of knowledge or notice that it should, by the exercise of reasonable care and precaution have discovered the condition and danger incident thereto of that pole. Your attention is particularly directed to that inquiry as you retire to your jury room."

The jury returned a verdict for the plaintiff in the sum of $7,483.63. Thereafter a motion for judgment notwithstanding the verdict was made, and was denied. Defendant then moved for a new trial, alleging, among other grounds therefor, that the verdict was excessive. The trial court sustained such claim, stating in his opinion that a new trial would be granted unless the plaintiff consented to remit all over and above the sum of $5,000. This was done, and judgment was entered accordingly. Defendant has appealed, asserting that under the proofs introduced on behalf of plaintiff it was entitled to a directed verdict, that the motion for judgment *non obstante veredicto* should have been granted, and that, if the matter of defendant's negligence was a proper question for determination by the jury, errors in the admission of testimony require the granting of a new trial.

The provisions of the statutes under which plaintiff claims the right to maintain the present action are as follows:

"Any person or persons sustaining bodily injury upon any of the public highways or streets in this State, by reason of neglect to keep such public highways or streets, and all bridges, sidewalks, crosswalks and culverts on the same in reasonable repair, and in condition reasonably safe and fit for travel by the township, village, city or corporation whose corporate authority extends over such public highway, street, bridge, sidewalk, crosswalk or culvert, and whose duty it is to keep the same in reasonable repair, such township, village, city or corporation shall be liable to and shall pay to the person or persons so injured or disabled just damages, to be recovered in an action of trespass on the case before any court of competent jurisdiction." (CL 1948, § 242.1 [Stat Ann § 9.591])

"It is hereby made the duty of townships, villages, cities, or corporations to keep in reasonable repair, so that they shall be reasonably safe and convenient for public travel, all public highways, streets, bridges, sidewalks, crosswalks, and culverts that are within their jurisdiction, and under their care and control, and which are open to public travel." (CL 1948, § 242.3 [Stat Ann § 9.593])

"No township, village or city in this State shall be liable in damages, or otherwise, to any person or persons for bodily injury, or for injury to any property sustained upon any of the public highways, streets, bridges, sidewalks, crosswalks or culverts, in such townships, villages or cities, except under and according to the provisions of this act, and the common-law liability of townships, villages and cities of this State, for or on account of bodily injuries sustained by any person by reason of neglect to keep in repair public highways, streets, bridges,

sidewalks, crosswalks or culverts, is hereby abrogated." (CL 1948, § 242.5 [Stat Ann § 9.595])

"If said public highway, street, bridge, sidewalk, crosswalk or culvert is in a condition which is not reasonably safe and fit for travel either by persons, animals or vehicles, because of defects in the original construction, then it shall not be necessary to show that any notice thereof was brought to the attention of such township, village or city, before a recovery can be had. If the defect is caused by said highway, street, bridge, sidewalk, crosswalk or culvert becoming out of repair, it shall be conclusively presumed that the township, village or city had notice thereof and a reasonable time in which to repair the same, provided said defect has existed for a period of 30 days or longer." (CL 1948, § 242.6 [Stat Ann § 9.596])

The trial judge came to the conclusion, based on the evidence in the case, that the issues of negligence, notice or knowledge, and proximate cause, were properly for the jury to determine. In reaching such conclusion reliance was placed on the decision of this Court in *Rufner* v. *City of Traverse City,* 296 Mich 204. On behalf of plaintiff it is contended that the rulings of the trial court of which defendant complains were correct, and that there was no error in the receiving of testimony sufficiently prejudicial to require the granting of a new trial. Before discussing the nature and sufficiency of plaintiff's proofs it becomes necessary to determine whether any material part of such proofs should have been rejected.

In support of plaintiff's claim that the post was not properly safeguarded or maintained because of the failure to provide a proper ground therefor she offered the testimony of a witness who had studied electricity in Ohio State university, and who had had many years of practical experience, largely in the employ of Consumers Power Company. He gave

testimony indicating that it is standard practice to use a ground wire with a metal post, even though the post rests on a cement foundation. Objection was made on the ground that the witness indicated by the form of his answers that he "thought" such to be the practice. Following a motion to strike based on the ground indicated, the witness stated that such was the practice with his employer. Further objection was made that such answer was incompetent, whereupon the witness testified:

"So far as I know every company follows that procedure.

"I know of a great many companies—the Detroit Edison, the Chicago Edison, and some of the larger ones. The Toledo Edison. We are thinking of our immediate neighbors. Various companies supplying. Many, many towns in the immediate vicinity. As to why a separate ground wire is fastened to the structure even though it is set on a concrete base, the concrete base in itself does not constitute a ground. That is, we have no way of knowing whether it is grounded or not—a ground potential."

After the witness completed his statements no motion to strike was made. In view of the explanation finally offered by him, indicating the scope of his knowledge on the matter, the failure to sustain defendant's motions to strike out the answers first made was at most harmless error.

Defendant contends that all testimony relative to the grounding of the post was inadmissible because the declaration failed to allege specifically negligence in that respect. At the time the testimony was received no claim was made that the allegations in the declaration were not sufficient to cover negligence, if such there was, in the safeguarding and maintenance of the post, including a proper ground. Not having been seasonably raised, the objection now comes too late. *Taskey* v. *Paquette,* 324 Mich 143.

Complaint is also made that the witness was permitted to answer the question: "What would have caused the electrocution of the boy?" The question was based on a statement of facts disclosed by other testimony in the case, concerning which there seems to be no dispute. The objection was made on the ground that the question sought the conclusion of the witness and invaded the province of the jury. Attention is called to *De Haan* v. *Winter,* 258 Mich 293. There the ultimate question at issue was whether the alleged malpractice of the defendant caused the condition of which the plaintiff complained. The question, which this Court found objectionable, called for the opinion of the witness as to the cause of the condition. In the case at bar there is no question as to the electrocution of plaintiff's decedent. It is not disputed that the post was charged with electricity, and that the current passed through his body. The question sought an explanation from the witness, who, because of his experience and training, must be regarded as an expert, as to why the current followed such course. The witness obviously so interpreted it, for he gave the following answer:

"It is a well known fact that electrocution is caused by current passing through the body. Therefore, one of the wires had to be in contact with the post and the current pass from the post through his body to the ground. He would have to establish a path for the current to flow in order to be electrocuted."

The witness was not asked to state, and did not undertake to state, his opinion whether the electrocution was the result of defendant's negligence. On the record before us it cannot be said that receiving the testimony was prejudicial error. It may be further noted that the superintendent of defendant's lighting plant had previously given testimony, without objection, of like import.

Plaintiff also produced as a witness an electrical engineer, a graduate of the university of Michigan, who had had several years of experience. He gave testimony with reference to the proper grounding of a metallic post of the character involved in the instant case. After he had been examined at some length by counsel on both sides, he indicated that, in answering certain questions, he had assumed that the post was not properly grounded. Motion was made to "strike out the questions and answers on the ground that there is no factual testimony to support it." The court denied the motion, which did not specifically state what questions and answers defendant wished stricken. In any event the reason assigned, a lack of factual testimony to support the opinion of the expert, was not tenable. There was in the case evidence indicating the reasons why the post should have been properly grounded, the manner in which it was placed on the cement and attached thereto, the absence of probability of efficient grounding, and the general condition of defendant's system of street lighting. In view of the proofs in the case, particularly with reference to the manner in which the base of this post was attached to the cement, the testimony of the expert was admissible.

Complaint is also made that certain witnesses testified, for the purpose of showing the earning capacity of plaintiff's decedent, as to the wages paid by them for labor on their respective farms. The record indicates that there was no objection to such testimony except on the examination of one of the witnesses who stated that the amounts paid by him per hour were the usual wages paid in the community. Defendant was not prejudiced by this testimony; and may not now question proofs received without objection.

As before noted, the jury returned a verdict in the sum of $7,483.63, which by remittitur was subse-

quently reduced to $5,000. Judgment was entered for the latter amount. Defendant claims that such amount is excessive and not sustained by the proofs relating to the elements of damage for which plaintiff is entitled to recover. In a case of this nature the damages are largely prospective, and cannot be ascertained with accuracy. *Kinsler* v. *Simpson,* 257 Mich 7; *Cleven* v. *Griffin,* 298 Mich 139; *Anderson* v. *Kearly,* 312 Mich 566. The amount of the judgment, while somewhat larger than has been allowed in similar cases in past years, cannot be said to be beyond the range of the testimony. Plaintiff's decedent was a young man just past 16 at the time of his death, and the proofs indicate that he was in good health and was industrious. It also appears from the proofs that farm laborers in the community received from $1 to $1.50 an hour, and that workers engaged in harvesting and preparing beans and pickles for the market received from $8 to $12 per day. We are not persuaded that the judgment should be disturbed.

This brings us to a consideration of the principal question in the case, that is, whether plaintiff under her proofs was entitled to have the questions in issue submitted to the jury. As before noted, the trial judge relied on *Rufner* v. *City of Traverse City, supra.* There the plaintiff brought suit to recover damages because of the alleged negligent killing of his decedent, a 13-year-old boy. The defendant city owned and operated a municipal-lighting plant, which furnished power for street lighting. A pole located in the grass plat between the street curb and sidewalk, used for the support of a street light, fell, inflicting injuries from which the boy's death resulted. It was the claim of the plaintiff that the pole, which was 30 to 35 feet in height and 10 to 12 inches in diameter, was in such a defective condition as to constitute a hazard to traffic on the street. In-

spection following the accident disclosed that it had become rotted near the ground level so that about 2 inches only of solid wood remained. The proofs indicated that it had been erected approximately 20 years prior to the accident. There was no showing that it had ever been inspected after its installation. The city insisted by way of defense that street lighting was a governmental function, that the pole was maintained in connection therewith, and that the city was immune from liability for the injuries to plaintiff's decedent. After calling attention to the statute, above quoted, with reference to the duties of municipalities to keep their streets, highways and sidewalks in a reasonably safe condition for public travel, it was said in part:

"Assuming that the city in erecting and maintaining the pole in question was employed in a governmental function, it is our opinion that the above highway statute removed the immunity of the city from liability. The reason that a city was not liable at common law for injuries caused by defective highways was because the duty to repair was a public one, and thus, since the city in the management and control of its highways was acting in a governmental capacity, it was immune from liability. *City of Detroit* v. *Blackeby,* 21 Mich 84 (4 Am Rep 450); *Roberts* v. *City of Detroit,* 102 Mich 64 (27 LRA 572). In effect the above statute removes the exemption from liability and declares that the city must keep its highways reasonably safe for travel. * * *

"In the case at bar the pole was located between the sidewalk and the curb. It had not been inspected for a number of years, if ever. It stood there apparently safe and useful, but in fact poised as a menace and a danger to anyone passing that way. Under such circumstances the city was liable for any danger caused by its fall."

In the *Rufner Case* there was no claim that the installation of the pole which caused the injury was

defective. In that respect it differs from the case at bar. Here the testimony of plaintiff's witnesses, corroborated to a certain extent by the statements of the superintendent of defendant's lighting plant, raised a question as to whether the metal post was adequately grounded, or in fact grounded at all. If the hazard plaintiff claims existed resulted from improper installation, such fact did not constitute a defense under the statute imposing liability for failure to maintain the sidewalk in a reasonably safe condition. *La Due* v. *Township of Lebanon,* 222 Mich 301. If the installation was defective, the defendant was charged with knowledge of that fact. See, also, *Buhler* v. *City of Detroit,* 274 Mich 139; *Kibele* v. *City of Philadelphia,* 105 Pa 41; *Lawrence* v. *Scranton City,* 284 Pa 215 (130 Atl 428, 41 ALR 454).

We are here concerned primarily with the interpretation of the provisions of the general highway law, above quoted, which, as pointed out in the *Rufner Case,* modified to the extent there indicated the doctrine of governmental immunity on the part of municipal corporations of the State. The language above quoted from the opinion in that case is applicable to the situation in the case at bar. The superintendent of defendant's lighting plant testified with reference to the operation of the street lights and the condition of the system generally. Because of its significance in the case, we refer to his testimony at some length. He stated that the metal post was close to the center of the sidewalk, that following an electrical storm 2 days before the accident the lights were not working properly, and that trouble was located in the wires leading to the post in question. New wires were installed, and the post was taken down, but no examination made as to the condition of the wires within it. The witness further stated that if any such wires were exposed

by reason of the insulation being worn off, and came in contact with the metal, the steel became charged with electric current, and that this had happened previously in defendant's street-lighting system. The witness testified further, as follows:

"*Q.* After this boy was killed you took this pole down?

"*A.* Yes.

"*Q.* And you examined it?

"*A.* That is right.

"*Q.* And near the top of the post but too far down for you to reach, you found a bare wire where the insulation was worn off?

"*A.* There was a spot there that was burned.

"*Q.* And the burning of that spot is caused by the current passing from the wire to the steel casing, isn't it?

"*A.* Yes.

"*Q.* And when that happens the steel casing becomes charged with electric current?

"*A.* Yes.

"*Q.* Now, you didn't examine this post on Friday when you were there with your men, did you?

"*A.* Yes, after we got through with it.

"*Q.* You didn't take the light above and look down to the wire, did you?

"*A.* No, it would be too dark. You couldn't see that.

"*Q.* You don't know when that insulation was worn off or burned off so it let the electricity go to the casing, do you?

"*A.* No, I don't.

"*Q.* Now then, when there is a short such as caused by the electricity leaving the wire into the casing, that has an effect upon the light on top of the post, doesn't it?

"*A.* Yes.

"*Q.* And sometimes causes the light to flicker?

"*A.* Yes.

"*Q.* That is one of the ways that you electricians have in finding trouble, when you find a light that flickers or is unusually dim, that helps a lot. Now we had had a thunder storm Thursday night here at Hart?

"*A.* Yes.

"There was quite a little rain, it wasn't real heavy. It was a good fall October rain. The walk was wet when this boy was killed. Everything connected with that walk, pole and that wire was all damp. Most all of the plates on the other posts in Hart were off. They were taken off by snow plows and things like that and even lost. They weren't fastened on very good. There wasn't any of them on very well. As to whether if that plate had been left on there, it would have kept some of the moisture from blowing in on those wires, I don't think that would help. The inside of the post was wet from sweat and the pavement was wet from sweat. The rain and wet could blow in there. When we examined the post after the boy was killed it was wet inside. If the plate had been on it would have kept part of it out. As to whether the pole or post, when I left there on Friday, was bolted down tight to the walk, I figured it was. I wasn't there when the boys put it back up.

"*Q.* Did you examine it after they left it?

"*A.* After this accident I examined it and it was just a little loose.

"*Q.* When you say a little loose, what do you mean?

"*A.* The top would probably sway a half inch on an 8-foot post.

"*Q.* Do you know how long it had been loose that way?

"*A.* No, I don't. There wasn't any of them real tight anywheres; you couldn't keep them tight.

"The vibration and the washers, a lot of them were all rusted out, with nothing in there at all where the washers should be, and leaving that thickness, there open. On this post they were old washers and they weren't rusted out. We used them again. The bolts

were new at the time the post was put up. They were quite badly deteriorated.

"*Q.* It wasn't in first-class condition, was it?

"*A.* No.

"*Q.* How long had it been out of first-class condition?

"*A.* Well, I couldn't say. We didn't go around and inspect them at all. Never tried to do that; didn't think it was necessary.

"*Q.* How often were those poles inspected, Mr. Schaner?

"*A.* Just when we would have trouble with them; that would be the only time.

"*Q.* You don't have any record of ever inspecting this pole before this time?

"*A.* Not at all.

"*Q.* If it had been inspected you would know about it?

"*A.* You bet. We always took care of those things just as soon as we could.

"*Q.* Well, the system you had then—the poles were not an up-to-date electric system as of 1946, was it?

"*A.* No.

"*Q.* It had been more or less secondhand for a number of years before 1946?

"*A.* It was really an old system.

"If the current was going from the wire into the steel pole and the boy walked up and put his hands on it that would create a short and would throw the electric current from the steel pole through his body down into the cement. It would make an electric wire of him. As to how the electric current could leave the wire and go into the steel post except by an arc across or touching the steel post, that is the only way it could.   *   *   *

"As to whether there have been other instances of people receiving shock, only us men working them at times. We received little shocks specially when it was wet. As soon as the boy was hurt we came

through there to put on our new circuit. This would be this same week, Monday, we started that week. We had our new circuit right to the corner and were ready to go west with it. This particular lamp post was never used again for lighting purposes."

The witness further stated in answer to questions of defendant's counsel that the work of changing the system was started about a month before the accident, that it had not been done earlier because of the inability to obtain materials, and that changes were made as rapidly as possible after supplies became available. This witness had worked for the plant approximately 20 years prior to the accident involved in this case.

Commenting on the function of a ground, one of the expert witnesses for plaintiff testified:

"Electricity will follow the path of least resistance. It will follow a circuit where the resistance is lowest. If a ground, an artificial ground, driven into the soil, had been there, which was of considerably lower resistance than the path from the post through his body, the current would undoubtedly have flowed through the ground."

His testimony was corroborated by that of the other expert witness for plaintiff, who also stated that in his opinion the bolts with which the base of the post in question was fastened to the cement did not constitute a proper ground.

Without discussing the testimony in further detail, plaintiff's proofs tended to show that defendant's street-lighting system had been in operation for many years, that the wires within the posts were never inspected unless trouble therein was indicated by use of a meter, that electric wiring deteriorates with age, especially on exposure to moisture, that the post in question was not protected by a plate at the base and by adequate grounding, that it was so lo-

cated as to be a menace to persons on the sidewalk if it became charged with electricity, and that defendant's employees had discovered such a situation existing with reference to other posts in the system. The testimony as to the condition of the system generally was received without objection, and under the circumstances of the case was entitled to consideration. *Brown* v. *City of Owosso,* 130 Mich 107. See, also, *Eaton* v. *Consumers Power Co.,* 256 Mich 549.

In considering the question whether defendant was entitled to a directed verdict, the testimony must be construed as strongly as possible in favor of the plaintiff. *Ortynski* v. *Grand Trunk Western Railroad Co.,* 307 Mich 61; *Wiles* v. *New York Central Railroad Co.,* 311 Mich 540. The specific inquiry is whether this court can say, as a matter of law, giving to plaintiff's proofs the strongest probative force to which they are entitled, that the evidence was not sufficient to justify submitting to the jury the questions of defendant's negligence and its knowledge or notice of the situation. *Prisel* v. *Coney,* 168 Mich 602. Based on a consideration of the record, we come to the conclusion that the trial court was not in error in refusing to direct a verdict for the defendant, and in denying defendant's motions for judgment *non obstante veredicto* and for a new trial.

The judgment is affirmed, with costs to the plaintiff.

BOYLES, C. J., and REID, NORTH, DETHMERS, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.