ELLIOTT *v.* DETROIT UNITED RAILWAY.

1. DEATH — MINORS — DAMAGES FOR PROSPECTIVE EARNINGS MUST BE SPECIALLY PLEADED.

In an action under the death act by the administrator of a deceased infant's estate for damages for his wrongful death, damages for loss of prospective earnings are special in their character, and must be specially pleaded.

2. SAME—MEASURE OF DAMAGES.

The measure of damages in such case is limited to the prospective earnings of the child until he became 21

On excessive or inadequate damages for personal injuries to minors resulting in death, see note in L. R. A. 1916C, 870.

On reference by prosecuting attorney in argument to jury to result in other case, see note in 38 L. R. A. (N. S.) 1130.

years of age, taken in connection with his prospect of life, less the expenses of his own care and support.

3. SAME—RULE OF LAW AS TO PECUNIARY DAMAGES UNCHANGED BY JUDICATURE ACT.

The rule of law relative to pecuniary damages sustained by those legally entitled to the prospective earnings of a minor in case of his instant death has not been changed by the judicature act.

4. SAME—DAMAGES—EXCESSIVE VERDICT.

A verdict for $7,500 damages, under the death act, for the prospective earnings of a boy 15 years and 8 months of age, *held*, excessive under the evidence which showed that he was not regularly employed, that the most he had earned was $15 a week, and that his support would cost from $4 to $10 a week.

5. SAME—EVIDENCE—ADMISSIBILITY—EXCESSIVE VERDICT.

Although it is competent, in an action under the death act for damages for the wrongful death of a minor son, to show the circumstances, age, health, and means of support of the beneficiaries, it was reversible error to allow the father to testify to the distressing details of an accident which disabled him about a year before and to testify that it was necessary, by reason thereof, for his wife, who was crippled with rheumatism, to take in washings, where said testimony was reflected in an excessive verdict.

6. SAME—TRIAL—ARGUMENT OF COUNSEL—STREET RAILWAYS.

Argument by plaintiff's counsel, in which he stressed objectionable testimony as to deceased's crippled mother taking in washings, and made an emotional appeal of passionate condemnation against speed maniacs and defendant street railway company, and based an inflammatory appeal on what he asserted some other court was doing with speed maniacs, *held*, reversible error.

BIRD, J., dissenting.

Error to Wayne; Goff (John H.), J. Submitted June 7, 1923. (Docket No. 67.) Decided March 5, 1924.

Case by Fred Elliott, administrator of the estate of Cecil N. Elliott, deceased, against the Detroit United

Railway for the negligent killing of plaintiff's intestate. Judgment for plaintiff. Defendant brings error. Reversed.

*William G. Fitzpatrick* (*Frederic T. Harward,* of counsel), for appellant.

*Edward N. Barnard,* for appellee.

STEERE, J.    On the evening of December 16, 1919, plaintiff's intestate was struck and killed by a southbound limited car on the interurban line between Detroit and Mt. Clemens, at a place called Halfway, located, as the name implies, about an equal distance from each of those cities.    Limited interurban cars did not stop there.    Deceased was a youth 15 years and 8 months of age.    When killed he was on the railway track helping his brother push from it a Ford automobile which had stalled there.    They, with another brother and his wife, were driving in the Ford auto northerly from Detroit towards Mt. Clemens on Gratiot avenue or road along which the interurban line ran, its tracks being on the side and some two feet or more away from the paved part of the road. At Halfway they turned across the railway and drove towards a lighted store located 30 feet from the track, at first taking it for "Rogers," which was two miles further along, and, discovering their mistake, circled round to cross the track and get back onto the pavement again.    When the car stalled on the track deceased and the brother who was not driving got out, cranked the auto and proceeded to push it backward clear of the track.    The night was dark and stormy. It was or had been snowing.    Plaintiff's witnesses said it was not snowing at that time but had been. The weather reports and defendant's witnesses showed that it was then snowing.    In shoving the auto backward off the track deceased pushed on the left-hand

fender, said to be nearest the approaching car, while his brother pushed on the right-hand fender. When the interurban came upon them the auto was clear of the track and untouched by it. The brother saw its approach in time to spring clear of the track, shouting a warning as he did so. Deceased was struck and carried upon the fender of the interurban until it stopped, a distance variously stated at from 400 to 1,000 feet. When taken from the fender he was dead, whether death was instantaneous is in dispute.

Plaintiff's declaration plants the action under the death act. The grounds of negligence charged against defendant are an excessive speed of 40 miles an hour, failure to give warning by whistle or otherwise and failure to display any headlight. That the interurban was running at a speed of between 40 and 45 miles an hour until close upon the scene of the accident is not denied. Some of plaintiff's witnesses estimate a greater speed. It was equipped with an arc headlight and whistle. The testimony of witnesses for the respective parties is in conflict as to whether the whistle was sounded and the light displayed. A motion by defendant for a directed verdict in its favor on account of deceased's contributory negligence was denied. Verdict was rendered in plaintiff's favor for $7,500, followed by judgment for that amount. A motion by defendant for a new trial on various grounds, including the claim that the verdict was against the weight of the evidence and excessive, was denied.

Defendant freights the record with 69 assignments of error, many of which may be passed without discussion. The most meritorious assignments involve the questions of contributory negligence, excessive verdict, claimed erroneous admission of testimony directed to the measure of damages, intemperate and prejudicial appeal and assertion to the jury by plaintiff's counsel, and that the testimony does not support

the verdict. Passing the questions of defendant's negligence and deceased's freedom from contributory negligence, we are impelled to agree with defendant's complaint that upon this record the intemperate assertions of plaintiff's counsel are prejudicially reflected in the amount of the verdict, which fails in evidential support and is manifestly excessive.

Plaintiff declared under the death act. During the trial the court said, and counsel made no protest: "It is conceded he is trying this case under the instantaneous death act and he is to be governed by that." No special pecuniary damages are alleged in the declaration. The subject is only mentioned in the *ad damnum* clause where plaintiff "demands judgment against the defendant for damages in the sum of $20,000;" neither does it count upon pecuniary loss of prospective earnings of the intestate. In *Hurst* v. *Railway*, 84 Mich. 546, it is said: "Such damages for loss of prospective earnings are special in their character, and must be specially pleaded." In *Rouse* v. *Railway*, 128 Mich. 149, that rule is re-stated and it is further said, referring to the *Hurst Case*,—

"In that case the measure of damages was also limited to the prospective earnings of the child until he became 21 years of age, taken in connection with his prospect of life less the expenses of his own care and support."

Whatever may be claimed as to the effect of the judicature act upon that rule of pleading, the rule of law relative to pecuniary damages sustained by those legally entitled to the prospective earnings of a minor in case of his instant death has not been changed. In *Beach* v. *City of St. Joseph*, 192 Mich. 296, 305, the rule is again stated as follows:

"The action here, however, is by the administratrix of intestate's estate, and the recovery is had under the statute * * * for the benefit of the parents, for the pecuniary loss sustained by them. The measure

of damages, if any, is limited to the prospective earnings of the child until she should arrive at the age of 21 years, taken in connection with the prospect of life, less the expense of her care and support."

The trial judge correctly instructed the jury as to the measure of damages on that basis, but on what theory or supporting evidence the jury under the law arrive at the amount awarded is not disclosed.

Plaintiff's testimony was to the effect that deceased was a healthy, normal, well-behaved boy, and helpful for his age, who had lived with his parents and regularly attended school until close of the school year in the spring preceding the accident.    As he grew older and able to earn something he worked for others at times, when free from school and in vacation, and had earned on such occasions as much as $10 per week. During the summer preceding his death his last employment, starting in July, was with a tabulating machine company as a messenger boy at $15 per week. His father testified he gave all his wages to him, while other members of the family said that he sometimes gave all his wages to his parents and sometimes did not.    He lived at home, had learned no trade or skilled vocation and until shortly before his death had experienced no regular employment.    The lowest estimate by members of his family as to what it would cost to support him was "$4 or $5" and the highest $10 per week.    Assuming that he would contribute to the support of his parents $10 per week for the next five years and four months, until he reached his majority, computed on present value, as is the rule, his contributions would be but a fraction of the amount awarded by the jury.

Deceased's parents were living.    His father was a carpenter "between 55 and 60" years old, and his mother "probably a little over" 50 years of age. While it was competent to show the circumstances, age, health and means of support of the beneficiaries

226—Mich.—7.

(*Peklenk* v. *Isle Royale Copper Co.,* 187 Mich. 644), it is persuasively contended for the defense that plaintiff's counsel was permitted against objection to feature and emphasize that line of testimony with prejudicial details both in evidence and argument. Members of the family testified that the father was hurt about a year before while working in the Detroit shipyard, while the mother was crippled with rheumatism and both were unable to work, but that the mother did work out as a washerwoman to help support the family. The father was permitted against repeated objections to enlarge upon the distressing details of the accident which befell him in the shipyard and his wife working as a washerwoman, in part as follows:

"*Q.* As a carpenter where were you working prior to the time you were injured?

"*A.* At the Detroit ship-building works. I was running a rip-saw at the time.

"*Q.* What happened to you with that company?

"*A.* I was struck by a board off the rip-saw, it struck me right over the head, right there.

"*Q.* What, if any, injury was occasioned by this board striking you? * * *

"*A.* It broke two ribs. I had two ribs broken and was hurt inwardly, beside.

"*Q.* Were the ribs driven into any organs of the body?

"*A.* Yes, they were driven in.

"*Q.* Did you have any difficulty with your lungs as a consequence of these ribs being broken?

"*A.* Yes, sir. * * *

"*Q.* What is the condition of your health?

"*A.* It has never since the accident been as good. * * *

"*Q.* State whether or not when you were hurt and cut off from your employment it was necessary that your wife work in a factory to help you to live.

"*A.* She went to work, yes, sir.

"*Q.* Is it necessary because of your injury and not having sufficient funds for her to have employment?

"*A*. It certainly is, and she is taking in washing right now."

In his address to the jury plaintiff's counsel, against repeated objections, broadcasted with the laundry work of deceased's crippled mother an emotional appeal of passionate condemnation against speed maniacs and defendant, running in part as follows:

"I say to you that that is little short of manslaughter, when they run a car 45 miles an hour. * * * He said he cannot stop unless he sees it, and he cannot see but 200 feet, and he says he will go at a rate where he cannot stop for a thousand feet, if the corporation says so. Have things come to that state? Have they come to a state where there is no heart, where people's sons and relatives have to be placed out here in the cemetery because a motorman gets an order to make a certain schedule? * * * That is what he said, I leave it to the exact words Mr. Davis used—'yes, I would do it if my schedule said so.' In other words, if they told him to kill a man, if it was the order of the D. U. R. he would kill him. * * * Because that is exactly what it means; if he says he cannot stop for a thousand feet, can only see 200 feet at the crossing, and he would drive 60 miles an hour, if the company said so, then if they said the word he would take a life if it happened to be there. * * * Now if you went home at night and you read in a newspaper that an assassin had jumped out and stuck his knife into human flesh, that is bad— * * * But I say to you it is even worse, that this boy was on the railroad track, where he had a right to be, to have this plunging instrumentality of death coming lunging in the darkness and take away a life, I say that is worse, and all we can say of that boy is that he is gone because this car was plunging along there. *. * *

"They demand human flies on buildings and aeroplanes in the air and all kinds of nonsense and because the D. U. R. gives them that speed, that corporation is loaded up with coppers in its treasury. * * * That is exactly what he claims; and he stands up before you, that they demand speed, to go out into the country, so that if that speed goes to such an extent

that that old lady and that old man have to lose the life of a boy, it is time that in the country we do what Judge Bartlett is doing in the city, take these speed maniacs and put them behind the bars where speed mania does not take human life. * * * I know the sympatheticalness of the D. U. R. and these lawyers who get down to a jury and say, this is a nice business proposition and that kind of stuff, that confidential talk."

It is contended for plaintiff that with few exceptions defendant's counsel failed to make specific objections, that no motion to strike out was made, and in but one instance was a specific ruling asked.   The presiding judge was present during the argument, and when objection was early made to that line of prejudicial declamation, ruled that, "in making his remarks he (plaintiff's counsel) must confine himself to the testimony" without otherwise passing on the propriety of the matter objected to.   Objections were repeatedly made on the ground that counsel's remarks were prejudicial, and in at least two instances a ruling by the court was insisted upon.   To one of them the court said, "I do not see anything in that," and to the other, which was directed to the last quotation, said:   "The ruling is he is proceeding properly."   In making the remarks to which objection was interposed, counsel did not confine himself to the record, amongst other things basing his inflammatory appeal to the jury on what he asserted some other court was doing with speed maniacs.

For the foregoing reasons the judgment must be set aside, with costs to defendant, and a new trial granted.

CLARK, C. J., and McDONALD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred with STEERE, J.

BIRD, J. (*dissenting*).   I do not concur in the opinion of Mr. Justice STEERE that this case should be reversed because of improper argument of counsel.

Many of the objections to the argument cannot be considered because no rulings were requested or obtained. *Crane* v. *Ross,* 168 Mich. 623; *Good Roads Construction Co.* v. *Railway Co.,* 173 Mich. 1; *B. Marx & Son* v. *King,* 177 Mich. 662. The remaining objections, when analyzed, fall far short of being reversible error.

Omitting that part of the argument to which objection was taken, but no rulings were made, we have remaining three objections which may properly be considered under the rule. These are the following:

(1) *"Mr. Barnard:* Because that is exactly what it means; if he says he cannot stop for a thousand feet, can only see two hundred feet at the crossing, and he would drive sixty miles an hour, if the company said so, then if they said the word he would take a life if it happened to be there.

*"Mr. Harward:* I object to that.

*"Mr. Barnard:* Then, you say, has a corporation a heart or soul?

*"Mr. Harward:* I object to that.

*"Mr. Barnard:* No, it has neither.

*"The Court:* Do you want a ruling?

*"Mr. Harward:* I want whatever you should do under such an objection.

*"The Court:* I rule that in making his remarks he must confine himself to the testimony.

(2) *"Final Argument by Mr. Barnard:* Gentlemen of the jury: Mr. Harward did exactly what I thought he would do; he talked about everything but the case; he told you what Bacon had to say, that Bacon had no regard for a jury, he told you Bacon said this and Longfellow said that; but this is an age of speed, this is the time the public demands speed; they demand human flies on buildings and aeroplanes in the air, and all kinds of nonsense, and because the D. U. R. gives them that speed, that corporation is loaded up with coppers in its treasury.

*"Mr. Harward:* I object to that. I want a ruling on that.

*"The Court:* I do not see anything in that.

(3) *"Mr. Barnard:* This lady said on the stand

that Jones said the whistle was blown.    Just read, Mr. Stenographer, whether it said Nelson or not.

    *"Mr. Harward:* I object to it.

(Here the stenographer reads the testimony about the Nelson switch, being the testimony on that point of Jessie Elliott.)

    *"Mr. Barnard:* He says that contradicts Miss Elliott's testimony, and he says that all the witnesses when coming in here, that I was going to eat them alive; I know the sympatheticalness of the D. U. R. and these lawyers who get down to a jury and say, this is a nice business proposition, and that kind of stuff, that confidential talk.

    *"Mr. Harward:* I object to all this, I would like a ruling.

    *"The Court:* The ruling is that he is proceeding properly."

1. This objection is not based upon any misstatement of fact. There is very little about the statement that would have a tendency to inflame or arouse the feelings of the jury. It was simply a reiteration of an old saw that everybody has heard a thousand times, and, as a matter of fact, it is true that corporations have neither hearts nor souls, and the jury knew that as well before as they did after counsel advised them of the fact.

2. To this objection the court said: "I don't see anything in that." A most fitting and appropriate ruling. Most of the argument was in answer to extraneous matters that counsel for the company had talked about, and the rest of it was of little consequence to either side.

3. This, in part, also appears to be in answer to certain argument made by defendant's counsel, and a comment upon the way defendant's lawyers addressed the jury. While the argument was not very helpful to the jury, it is not perceptible how it could have done any harm. In nearly all lawsuits where anything of importance is at stake, and counsel are urging their respective interests with zeal, more or less extraneous

and immaterial matter creeps in.   Counsel exchange witticisms, indulge in humor and say biting things to each other, and criticize the conduct of each other. The court, jurors and bystanders expect counsel will indulge these verbal weapons, and they make due allowance for them when considering the merits of the case.

In commenting upon the argument of counsel it is said in Ruling Case Law:

"Counsel should not be too closely confined in his argument to the jury.   The most liberal freedom of speech should be allowed.   He should be permitted to discuss the facts proved or admitted in the pleadings, arraign the conduct of the parties, and attack the credibility of witnesses, and he may indulge in oratorical conceit or flourish.   He may repeat the evidence verbatim for the purpose of commenting on it in the connection in which it was introduced at the trial."   2 R. C. L. p. 411.

"Various exceptions were taken to the remarks of Mr. Boudeman, one of the attorneys for the plaintiffs, in summing up the case to the jury.   While some of his deductions from the testimony, and claims made by him, might not coincide with our ideas, we find no such error in any of his remarks as would warrant a reversal of the judgment.   An attorney is entitled to some license in his argument and the testimony to him may bear quite different inferences and conclusions than might be deduced by a disinterested and unbiased judge.   But if we were to reverse cases because the attorneys of the parties claimed more from the testimony for their clients than we could discern in the evidence, or argued that facts were established when we thought they were not, we should not only invade the province of the jury, but vacate most, if not all, of the judgments that come for review before us."   *Dikeman* v. *Arnold,* 83 Mich. 218.

In the personal injury case of *Battishill* v. *Humphrey,* 64 Mich. 514, complaint was made of improper argument of plaintiff's counsel, and Mr. Justice CHAMPLIN summed the matter up in this way:

"Extravagant expressions are apt to be used in the heat of argument. Invective is sometimes resorted to, persuasions made, and forensic skill employed,—all with the design to influence the jury in behalf of a client. But all these arts and appliances are permissible so long as confined within legitimate bounds of the discussion of the facts before the jury; and if courts are to take it upon themselves to set aside verdicts because some irrelevant remarks are made use of by counsel in their arguments, they will find constant employment, and few indeed will be the verdicts which will be sustained."

Mr. Justice HOOKER observed in *Lathrop* v. *Sinclair*, 110 Mich. 329, where a similar claim was made, that:

"Error is also assigned upon the arguments of counsel, but we discover nothing therein that calls for a reversal of the case. We have repeatedly said that the injury must be apparent, or the abuse very great, before we would interfere with the exercise of the discretion of the circuit judge in relation to the language of counsel."

There is nothing in either one of the three objections that should call for a reversal of this case. There is no claim that counsel made any misstatement of fact, or that he unduly vilified any witnesses, or made claims not supported by the testimony, and there is no language in and of itself that could be tortured into any error unless it could be said that his statement that a corporation has neither heart nor soul was responsible for inflaming the jury and working them up to a pitch of excitement which induced them to give a larger verdict than they otherwise would have done. Just how this old hackneyed saying that has been worn threadbare in courts and in the press could excite twelve men so that they would lose sight of the merits of the case is not easily understood. The jury quite likely gave more of a verdict than the evidence sustains, but that is a thing which juries are prone to do in this class of cases. It would, in my judgment,

be setting a very bad precedent to say that a case which employed the attention of twenty men, beside the witnesses, for nearly a week, should be reversed for anything that can be found in these three objections, and especially is this so since there is no likelihood that any different results will be obtained in a rehearing.

I am of the impression, however, that the verdict is larger than the testimony will support:

"In considering this question the power of the appellate court to act and to vacate judgments, or to require an abatement from the amount recovered as a condition of affirmance must not be doubted. That such power rests in this court is beyond question. This power is absolutely essential to the proper administration of justice." *Fishleigh* v. *Railway,* 205 Mich. 161.

In the exercise of this power the court should in this case determine the limit to which a verdict could go and still be within the limits of the testimony. This would be fair to the defendant and we are practically asked to do that thing by the plaintiff if we shall find the judgment too large. The attorney for the plaintiff says in his brief, in discussing this question:

"We respectfully submit should the court feel called upon to reduce this verdict, a very substantial amount should be left with which to fully compensate these parents for any special and pecuniary loss they would suffer by reason of the taking off of their son."

After a careful consideration of the testimony we are satisfied that had the jury returned a verdict for $4,000 we should not have disturbed it. It would be possible and reasonable for a jury, under the testimony, to have found a verdict of this amount after taking into consideration the present scale of wages, the living costs, and the increase in wages he might have received as he advanced to his majority.

It is my judgment that this case should be reversed on the ground of an excessive verdict, unless plaintiff, within twenty days from the filing of this opinion, files in the trial court a remission of the judgment down to $4,000. If such remission be filed then the judgment should stand affirmed for that amount, otherwise it should be reversed, with costs to the defendant.