WYCKO v. GNODTKE.

1. STATUTES—CONSTRUCTION—LEGISLATIVE ACQUIESCENCE.
   A legislature legislates by legislating, not by doing nothing, not
   by keeping silent, by acquiescing in interpretations of statutes
   made.

2. DAMAGES—DEATH OF MINOR CHILD.
   The hitherto adopted rule for measure of damages suffered
   through the death of a minor child, his probable wages less
   the cost of his keep, is overruled.

3. DEATH—CONSTRUCTION OF DEATH ACT.
   The wrongful death act is remedial in character and should be
   construed liberally in favor of its beneficiaries (CL 1948, §§
   691.581–691.583).

4. SAME—PECUNIARY VALUE—COMPANIONSHIP.
   The pecuniary value of a human life is a compound of many
   elements, including mutual society and protection, companion-
   ship (CL 1948, §§ 691.581–691.583).

5. SAME—DAMAGES.
   Recovery of damages under the death act for the death of a
   minor is limited to pecuniary losses, including the child's wage-
   profit capability (CL 1948, §§ 691.581–691.583).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 50 Am Jur, Statutes § 326.
[2,5] 16 Am Jur, Death § 216.
   Measure and elements of damages for personal injury resulting
   in death of infant.  14 ALR2d 485.
[3] 16 Am Jur, Death § 57.
[4] 16 Am Jur, Death § 199.
   "Sentimental" losses, including mental anguish, loss of society,
   and loss of marital, filial, or parental care and guidance, as
   elements of damages in action for wrongful death.  74 ALR
   11.
[6] 16 Am Jur, Death §§ 216, 243.
   Measure and elements of damages for personal injury resulting in
   death of infant.  14 ALR2d 485.

6. Same—Minors—Damages—Remittitur—Prejudice.

> Trial court's order of remittitur from jury's verdict of $14,979.50 for death of 14-year-old boy, of all in excess of $8,479.50, including $979.50 funeral and burial expenses *held,* error, as the verdict of $14,000 was not so patently oppressive as to indicate prejudice, the remittitur being occasioned by application of the child-labor standard of pecuniary loss, an outmoded fiction (CL 1948, §§ 691.581–691.583).

Dethmers, C. J., and Carr and Kelly, JJ., dissenting.

Appeal from Berrien; Robinson (Thomas N.), J. Submitted April 8, 1960. (Docket No. 12, Calendar No. 48,322.) Decided September 16, 1960.

Case by John E. Wycko, administrator of the estate of John L. Wycko, deceased, against Armand Gnodtke and Emil Gnodtke for damages arising from the death of a 14-year-old boy struck by automobile. Verdict for plaintiff. Order granting new trial unless remittitur filed. Plaintiff appeals. Reversed and remanded for entry of judgment upon verdict.

*George S. Keller* and *Theron D. Childs,* for plaintiff.

*Seymour & Seymour* (*Dale A. Seymour,* of counsel), for defendants.

Smith, J. The case before us concerns, in general, damages for the life of a child negligently killed. Specifically it is whether or not a jury award of approximately $15,000 to the parents of a 14-year-old boy was excessive.

So far as the facts are concerned we will simply say that the deceased was walking, completely off a highway, with some other boy scouts. He was killed by an automobile owned by one defendant and driven by the other. The car suddenly ran onto the shoulder and hit 2 of the scouts. The plaintiff here is the administrator of the estate of one of them.

To substantiate the damage claims, testimony was introduced as to the boy's dependability, trustworthiness, and ambition. It was established that he helped his father and brothers work the family farm. Upon such evidence the jury awarded $14,000, plus $979.50 for funeral and burial expenses. The trial judge said it was too much. He said that the proofs justified an award of only $7,500, plus $979.50 for funeral and burial expenses, since no boy his age "could have had the earning capacity indicated by this verdict," and he ordered a new trial unless remittitur were filed.

Thus we come once more to a consideration of the problem of the "pecuniary loss" suffered by the parents of a deceased minor child. What we in Michigan have done, in common with many other courts, is to require the subtraction, from the hypothetical earnings of the child prior to his majority, the speculative costs of his rearing.[1] The difference, if any, we say is the parents' pecuniary loss. We have commented, in a prior dissenting opinion,[2] upon the unreal nature of the computation we of the courts (for nothing in the act so requires) have thus imposed upon the bereaved parents. In the present case, however, not only is the measure of damages once more under attack, but also its application by the trial court.

Lord Campbell's act[3] was the predecessor of the American wrongful death acts. It did not contain the words "pecuniary loss." It provided simply that "in every such action [for wrongful death] the jury may give such damages as they may think proportioned to the injury resulting from such death."[4] It was the leading case of *Blake* v. *Midland R. Co.*

---

[1] *Courtney* v. *Apple,* 345 Mich 223, and cases there cited.
[2] *Courtney* v. *Apple,* 345 Mich 223, 237 (dissenting opinion).
[3] Officially, fatal accidents act, 1846, 9 & 10 Vict, chap 93.
[4] Fatal accidents act, 1846, 9 & 10 Vict, chap 93, § 2.

(1852)[5] that interpreted this provision to limit the award of damages to the probable pecuniary loss to the beneficiaries, which limitation has been followed in some of the American statutes, including that of Michigan. We agree with Tiffany, however, that: "In spite of these differences in phraseology * * * the principles applicable to the measure of damages under all these acts is generally the same, *viz.*, that *the damages are measured by the pecuniary loss resulting to the beneficiaries of the action from the death.*"[6] We have, accordingly, considered cases from other jurisdictions in our analysis without differentiating according to the precise statutory wording employed.[7]

The interpretation of the requirement of pecuniary loss found in the early cases, which even today are followed as precedent, reflected the moral and legal standards of their times. In *Bramall v. Lees*,[8] the court considered the case of a 12-year-old girl,[9] negligently killed. Despite the fact that she had attained such age she remained, nevertheless, "living at home" and hence was "peculiarly then a burden to [her] parents." The father, however, succeeded in securing a verdict for 15 pounds. His theory was that in the course of a year or two the child would have gone into a factory "and taken back money as its earnings for the parents." A year or two in the future, however, was held "not sufficient to found an action." A rule nisi for a new trial was granted

---

[5] 18 QB (A & E NS) 93 (21 LJ QB 233, 118 Eng Rep 35).

[6] Tiffany, Death by Wrongful Act (2d ed), § 153, at p 323.

[7] See, also, *Ensor v. Compton*, 110 Neb 522, 524 (194 NW 458, 459), where it was said, with reference to the Nebraska statute from which had been stricken the words "pecuniary loss": "The loss under the statute is still a pecuniary loss."

[8] 29 LT (OS) 111.

[9] The original report does not mention the sex of the child. In *Chapman v. Bothwell*, 4 Jur (NS) pt 1, 1180, 1181, Sir Charles Crompton speaks as follows: "*Bramall v. Lees* (tried before me at the spring assizes at Liverpool in 1857), * * * was an action by the father for the death of a girl aged 12 years."

by the exchequer court. We find no further report. Apparently the case was settled on some such basis as the bar of our State so well knows in these child death cases. More fortunate was the father in *Duckworth* v. *Johnson*.[10] Here a verdict for 20 pounds was obtained "by reason of the son, a boy 14 years of age, having been killed by the falling of a wall in consequence of the defendant's negligence." The father, unlike Mr. Bramall, was able to show that his son had been working for 2-1/2 years. Chief Baron Pollock, after expressing the warning that this act was not intended "to enable persons to sue in respect of some imaginary damage" thought that the jury's determination of the "value of the boy's services, and the cost of boarding and clothing him" should not be disturbed, and the rule nisi to enter verdict for the defendant was discharged.

The judges so ruling we do not condemn. They were merely interpreting the statute in accordance with the social conditions of the day, which, presumably, the legislative body had in mind in the enactment of the legislation then under consideration. The rulings reflect the philosophy of the times, its ideals, and its social conditions. It was the generation of the debtor's prisons, of some 200 or more capital offenses,[11] and of the public flogging of women. It was an era when ample work could be found for the agile bodies and nimble fingers of small children. Defoe's England was not long past. He noticed with approval[12] that at Colchester and in the Tauton clothing region " 'there was not a child or in the villages round it of above 5 years old, but, if it was not neglected by its parents and untaught, could earn its bread.' " Halevy writes that the "number of children employed in factories was so

---

10 4 H & N 653 (29 LJ Ex 25, 157 Eng Rep 997).
11 13 Holdsworth, History of English Law, p 284.
12 As quoted in Trevelyan, English Social History, p 322.

great in proportion to the adults that it was out of the question to restrict the working hours of children without restricting at the same time the hours of adults."[13]   The apprenticeship of children to factory owners amounted to what Professor Trevelyan, Master of Trinity College, Cambridge, has described as "a slave traffic."[14]   "The atrocities visited upon these boys and girls" it is reported in the Encyclopaedia of the Social Sciences,[15] "literally driven to death in the mills, form one of the darkest chapters in the history of childhood."   Age limits were set in an effort to control the traffic.   In 1816 the apprenticeship of parish children under the age of 9 was forbidden,[16] but the underground employment of children under 10 was not forbidden until 1843,[17] just 5 years before the passage of the progenitor of our statute.   It is only against this somber background that we can fully understand the significance of the comment made in the *Bramall Case, supra,* that the girl was "living at home and getting nothing."   At the age of 12 she was already long overdue at the mill.

This, then, was the day from which our precedents come, a day when employment of children of tender years was the accepted practice and their pecuniary contributions to the family both substantial and provable.   It is not surprising that the courts of such a society should have read into the statutory words "such damages as they [the jury] may think proportional to the injury resulting from such death" not only the requirement of a pecuniary loss, but, moreover, a pecuniary loss established by a wage

---

[13] Cited in Trevelyan, English Social History, p 542.

[14] Trevelyan, English Social History, p 483.   See, also, 5 Encyc Brit 483 (1946 ed), describing the exploitation of very young children in industrial work.

[15] Vol 3, Child Labor, pp 413, 414.

[16] 56 George 3, chap 139, § 7, cited in 13 Holdsworth, History of English Law, p 313.

[17] Lord Shaftesbury's act, 5 & 6 Vict, chap 99, § 2.

benefit-less-costs measure of damages. Other losses were unreal and intangible and at this time in our legal history the courts would have no truck with what Chief Baron Pollock termed in *Duckworth, supra,* "imaginary losses." Loss meant only money loss, and money loss from the death of a child meant only his lost wages. All else was imaginary. The only reality was the king's shilling.

That this barbarous concept of the pecuniary loss to a parent from the death of his child should control our decisions today is a reproach to justice. We are still turning, actually, for guidance in decision, to "one of the darkest chapters in the history of childhood." Yet in other areas of the law the legal and social standards of 1846 are as dead as the coachman and his postilions who guided the coaches of its society through the dark and muddy streets, past the gibbets where still hung the toll of the day's executions. In most areas the development of the law has paralleled the enlightened conscience of our people. Examples abound. We no longer tolerate the intentional infliction of mental suffering. Illness from such cause is not, we now recognize, imaginary. A right to privacy is recognized, haltingly, it is true, but a start has been made. The exploitation of children by avaricious parents and guardians is no longer permitted, much less condoned. A combination of influences, all arising from the public condemnation of child labor, has resulted in almost universal State child-labor and compulsory school attendance laws.[18] In fact, our society, by one means or another, now attempts to keep children out of the general labor market. Yet there still exists in the law this remote and repulsive backwash of time and civilization, untouched by the onward march of society,

[18] See State Child-Labor Standards Bulletin 158, Combined Publications of United States Department of Labor and Bureau of Labor Standards, (1952).

where precedents we alone honor tell us that the
value of the life of a child must be measured solely
by the standards of the day when he peddled the skill
of his hands and the strength of his back at the fac-
tory gates. We are not unaware of the argument in
support of the proposition that legislative silence,
subsequent to decisions interpreting a statute, must
be construed as legislative acquiescence in the inter-
pretation made. Our thoughts thereon will be found
in our concurring opinion in *Sheppard* v. *Michigan
National Bank.*[19] We there expressed the view, with
appropriate citation of authority, that a legislature
legislates by legislating, not by doing nothing, not
by keeping silent.

It follows from the foregoing that we now reject,
as prayed by appellant, the child-labor measure of
the pecuniary loss suffered through the death of a
minor child, namely, his probable wages less the cost
of his keep, and all cases consistent therewith we
now overrule.

What, then, is the pecuniary loss suffered because
of the taking of the child's life? It is the pecuniary
value of the life. We are aware, of course, that there
are those who say that the life of a human being is.
impossible to value, that although we will grapple
mightily with the value of the life of a horse,[20] of a
team of mules,[21] we will stand aloof where a human
is concerned and assign it no value whatever.[22] This

[19] 348 Mich 577, 599–603; see, also, *Van Dorpel* v. *Haven-Busch Co.*,
350 Mich 135, 145–149.

[20] *Ellis* v. *Hilton*, 78 Mich 150 (6 LRA 454, 18 Am St Rep 438).

[21] *Jones* v. *Texas & P. R. Co.*, 125 La 542 (51 So 582, 136 Am St
Rep 339).

[22] *E.g., Hyatt* v. *Adams*, 16 Mich 180, 191, 192: "For myself, I
think * * * that the reason of the rule is to be found in that
natural and almost universal repugnance among enlightened nations
to setting a price upon human life, or any attempt to estimate its
value by a pecuniary standard, a repugnance which seems to have
been strong and prevalent among nations in proportion as they have
been or become more enlightened and refined, and especially so
where the Christian religion has exercised its most beneficent influence,
and where human life has been held most sacred. Among barbarous

kind of delicacy would prevent the distribution of food to the starving because the sight of hunger is so sickening.  But we cannot shirk this difficult problem of valuation.  In the cases coming to us a life has been taken and it is our duty, as best we can, to put a fair valuation on it.  In so doing, we will keep in mind that the act[23] is remedial in its character and our duty is to construe it liberally in favor of the beneficiaries.[24]

The pecuniary value of a human life is a compound of many elements.  The use of material analogies may be helpful and inoffensive.  Just as with respect to a manufacturing plant, or industrial machine, value involves the costs of acquisition emplacement, upkeep, maintenance service, repair, and renovation, so, in our context, we must consider the expenses of birth, of food, of clothing, of medicines, of instruction, of nurture and shelter.[25]  Moreover, just as an item of machinery forming part of a functioning industrial plant has a value over and above that of a similar item in a showroom, awaiting purchase, so an individual member of a family has a value to others as part of a functioning social and economic unit.  This value is the value of mutual society and

and half civilized nations, it has been common to find a fixed and prescribed standard of value or compensation for human life, which is often found to be carefully graduated by the relative importance of the position in the social scale which the deceased may have occupied.  While this has been the natural result, it has at the same time been, to some extent, the *cause* of their inhuman customs, their barbarous manners and social degradation, and of the comparatively low estimate in which human life has been held among them.

"To the cultivated and enlightened mind, looking at human life in the light of the Christian religion as sacred, the idea of compensating its loss in money is revolting."

[23] CL 1948, §§ 691.581–691.583 (Stat Ann 1959 Cum Supp §§ 27-.711–27.713).—REPORTER.

[24] Accord, *Cook* v. *Rafferty,* 200 Wash 234, 240 (93 P2d 376).

[25] See Dublin & Lotka, The Money Value of a Man; Weinstein, Jury Verdicts—Excessive or Inadequate, 39 Mich SBJ (Jan) 11; Comment, 54 NW U L Rev 254.

protection, in a word, companionship.[26] The human companionship thus afforded has a definite, substantial, and ascertainable pecuniary value and its loss forms a part of the "value" of the life we seek to ascertain. We are, it will be noted, restricting the losses to pecuniary losses, the actual money value of the life of the child, not the sorrow and anguish caused by its death. This is not because these are not suffered and not because they are unreal. The genius of the common law is capable, were it left alone, of ascertaining such damages, but the legislative act creating the remedy forbids. Food, shelter, clothing, and companionship, however, obtainable on the open market, have an ascertainable money value. Finally if, in some unusual situation, there is in truth, or reasonably forthcoming, a wage-profit capability in the infant (an expectation of an excess of wages over keep, the measure heretofore employed) the loss of such expectation should not be disregarded as one of the pecuniary losses suffered.[27] In such case, however, the assessment is made as a matter of fact and not of fiction. It is true, of course, that there will be uncertainties in all of these proofs, due to the nature of the case, but we are constrained to observe that it is not the privilege of him whose wrongful act caused the loss to hide behind the uncertainties inherent in the very situation his wrong has created.

The jury heard the testimony and was charged by the court on what we have here termed the child-labor

[26] See *Holder* v. *Key System*, 88 Cal App2d 925, 940 (200 P2d 98, 106), wherein it is held that "Although damages must be measured by the pecuniary loss to the plaintiffs, in fixing such loss the trier of the facts is not limited to proof of loss in dollars and cents, but may properly consider the pecuniary value of the loss of such noneconomic interests of a family as loss of comfort, society and protection." Also, *Bond* v. *United Railroads of San Francisco*, 159 Cal 270 (113 P 366, 48 LRA NS 687, Ann Cas 1912C, 50).

[27] *Cf.* Thoughtful discussion of related problem by EDWARDS, J., in *Thompson* v. *Ogemaw County Board of Road Commissioners*, 357 Mich 482.

measure of damages. As a result of its deliberations
its award was for $14,000, plus funeral and burial
expenses. This the trial judge set aside as excessive.
He said that no child this age had a $14,000 earning
capacity, but only one of $7,500, and ordered re-
mittitur. This was error. The jury's award is not
to be set aside unless so gross as to carry its own
obvious proofs of prejudice. But an award of
$14,000 is not so patently oppressive as to meet this
test, judged by modern standards, not only in our
own jurisdiction,[28] but elsewhere.[29]

Error, then, there was. But the error into which
the court was betrayed was the direct and natural
result of this Court's insistence upon the continued
employment of the child-labor standard of pecuni-
ary loss. Whatever the situation may have been in
1846, as the children brought home their wages from
plant, mine, and mill, today their gainful employment
is an arrant fiction and we know it. The trial judge
may have been on sound ground as a matter of
economics in saying that he didn't think the deceased
child had a $14,000 earning capacity. But we are
not dealing in economics. We are dealing with a fic-
tion, the fiction that under today's conditions, not
those of 1846, the minor child is a breadwinner. He
is not. He is an expense. A blessed expense, it is
true, but nevertheless an expense. We permit the
use of the fiction that he is a wage-earner solely in an
effort to accomplish a semblance of justice. If, in-
deed, this is our purpose, as it is, the fiction must be
allowed to operate in both directions. We cannot up-
hold a jury verdict for zero dollars and zero cents
pecuniary loss on the theory that the jury, after all,
made its computations and they evenly balanced,[30]

[28] *Elliot* v. *A. J. Smith Contractors*, 358 Mich 398.
[29] See cases cited in *Courtney* v. *Apple*, 345 Mich 223, 237 (dis-
senting opinion).
[30] *Courtney* v. *Apple*, 345 Mich 223.

yet upset a $14,000 verdict on the ground that the computations made were not real after all, that we know better. If a fiction is to be employed it must not operate solely on a one-way track, to be respected if no recovery results from its employment, but exposed for the fiction it is, and thus rejected, if an award substantial, though still within the bounds of reason, is made.

The fiction now employed as the measure of pecuniary loss should be abandoned. It perpetuates an attitude towards the value of a child's life completely repudiated by modern legislation and the enlightened child-welfare policies of this jurisdiction. It does violence to the intent of the act, which is to grant a recovery whenever a death "of a person" is caused by the wrongful act of another. The child is a person and is not to be read out of the act by judicial acquiescence in the chief baron's theory that his life has no pecuniary value save as that of a wage-earner. The bloodless bookkeeping imposed upon our juries by the savage exploitations of the last century must no longer be perpetuated by our courts.

The order granting new trial subject to remittitur is reversed and the case remanded for entry of judgment upon the verdict of the jury. Costs to appellant.

Black, Edwards, Kavanagh, and Souris, JJ., concurred with Smith, J.

Carr, J. (*dissenting*). The traffic accident from which this case has resulted occurred on a public highway in Berrien county on August 26, 1957. Plaintiff's decedent, a boy 14 years of age, was struck by an automobile, driven by defendant Armand Gnodtke and owned by the other defendant, sustaining injuries that resulted in immediate death. Plain-

tiff administrator brought action for damages claiming negligence on the part of defendant Armand Gnodtke, and based the right of recovery on the Michigan death act.*

The case was tried before a jury which returned a verdict in favor of the plaintiff in the sum of $14,979-.50. It appears that the funeral expenses amounted to $979.50, and death being instantaneous no damages were included for pain and suffering on the part of decedent. Defendants moved for a new trial alleging as a basis that the verdict was excessive in amount. The trial judge agreed with the claim and ordered a new trial unless within 15 days from the date of the order the plaintiff should remit the amount of the verdict in excess of $8,479.50. From such order plaintiff has appealed.

The basic issue in the case is whether the trial judge abused his discretion in making the order in question. Involved in the controversy is the interpretation of pertinent provisions of the death act, above cited, and the further question whether the rule with reference to the computation of damages in a case of this nature, heretofore recognized in this State, should be modified in such manner as to permit the trier of the facts to award damages of a nature that hitherto have not been considered as within the scope of the statute. It may be noted in this connection that counsel for the plaintiff requested the trial court to charge the jury that in computing damages:

"You may take into consideration and employ as a yardstick or measure of damages, the investment of the parents in their child from the time of his birth, including prenatal, hospitalization and medical care of confinement, through infancy and schooling up to the time of his death, including funeral expenses."

---

* PA 1848, No 38, as amended (CL 1948, § 691.581 *et seq.* [Stat Ann 1959 Cum Supp § 27.711 *et seq.*]).

This the trial judge refused to do, charging the jury in accordance with the recognized interpretation of the death act. In substance the jury was told that the measure of damages would be the value of the services of John L. Wycko to his parent over and above the cost and expense of educating, clothing, and maintaining him, together with the payment of such other ordinary expenses as might be expected to be incurred, during the years before majority. Testimony was offered on behalf of plaintiff tending to show that his decedent was an industrious lad, that he did chores on his father's 10-acre farm, including the picking of berries and similar tasks, and that he was of good habits. He had not worked for others for pay. The record does not disclose how far he had advanced in school, nor that he was particularly gifted in any special regard. The testimony of others, parents of minor sons, was introduced as bearing on the question as to the value of the services that decedent might reasonably be expected to have rendered, before attaining majority, to and for the benefit of his father.

It is undisputed that at common law there was no right of action for damages for negligently or feloniously causing the death of a human being. With reasons for such rule we are not here concerned. In 1846 a statute was enacted in England (9 & 10 Vict, chap 93), known as Lord Campbell's act, which permitted the recovery of damages in such a case for the benefit of designated surviving relatives. Said statute did not in terms refer to damages being based on the pecuniary injury sustained by such relatives, but it was so construed by the English courts. The situation existing in Michigan was well stated in *Lincoln* v. *Detroit & Mackinac R. Co.*, 179 Mich 189, 195, 196 (51 LRA NS 710), as follows:

"We summarize the following from the American authorities: The death loss act of the English statute of 1846 (9 & 10 Vict, chap 93), commonly called 'Lord Campbell's act,' and the various laws of a similar kind that have been modeled after it, gave a new cause of action unknown to the common law, for the benefit of certain designated classes of surviving relatives. Such relatives do not take the cause of action for damages to the deceased by transfer to them by operation of law, or otherwise, but are enabled by the statute to recover the pecuniary loss to themselves caused by the wrongful taking off of the decedent, the continuation of whose life would have been beneficial to them. The action accrues to the surviving beneficiary mentioned in the statute by reason of the death of the injured person caused by the wrongful act of another. It is strictly not proper to say that it is a cause of action which survives; it is rather a new action given by CL 1897, §§ 10427, 10428 (How Stat [2d ed], §§ 13702, 13703), which can be brought, not for the benefit of the estate but solely for the benefit of the beneficiaries named in the statute."

The Michigan legislature at the session of 1848 enacted Act No 38 of said year, which was entitled:

"An act requiring compensation for causing death by wrongful act, neglect or default."

The first section of said act created the cause of action indicated by the title, and the second section directed that the action must be brought by and in the name of the personal representatives of the deceased person, and the amount recovered should be for the exclusive benefit of the widow and next of kin thereof to be distributed to such beneficiaries in the proportion fixed by statute for the distribution of personal property left by persons dying intestate. In every such action the jury was authorized to give such damages as might be deemed fair and just "with

reference to the pecuniary injury resulting from such death, to the wife and next of kin of such deceased person."

It thus appears that in the inception of the death act the damages were limited to compensation for the "pecuniary injury" sustained by the beneficiaries under such recovery. The phraseology of section 2 was modified to some extent by PA 1873, No 94. Said section as so amended (CL 1929, § 14062 [Stat Ann § 27.712]) read as follows:

"Every such action shall be brought by, and in the names of, the personal representatives of such deceased person, and the amount recovered in every such action, shall be distributed to the persons and in the proportions provided by law in relation to the distribution of personal property left by persons dying intestate; and in every such action the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury resulting from such death, to those persons who may be entitled to such damages when recovered."

The death act was in substance reenacted by PA 1939, No 297, above cited. The title and both sections of the original act were amended, and a third section containing a repealing provision was added. With the changes made in section 1 we are not concerned in the instant case. The title of the act was broadened to read as follows:

"An act requiring compensation for causing death and injuries resulting in death by wrongful act, neglect or default; to prescribe the measure of damages recoverable and the distribution thereof; and to repeal inconsistent acts."

For purposes of comparison with section 2 of the prior statute, we set forth section 2 of the re-enactment of 1939 as follows:

"Every such action shall be brought by, and in the names of, the personal representatives of such deceased person, and in every such action the court or jury may give such damages, as, the court or jury, shall deem fair and just, with reference to the pecuniary injury resulting from such death, to those persons who may be entitled to such damages when recovered and also damages for the reasonable medical, hospital, funeral and burial expenses for which the estate is liable and reasonable compensation for the pain and suffering, while conscious, undergone by such deceased person during the period intervening between the time of the inflicting of such injuries and his death: *Provided, however,* That such person or persons entitled to such damages shall be of that class who, by law, would be entitled to inherit the personal property of the deceased had he died intestate. The amount recovered in every such action for pecuniary injury resulting from such death shall be distributed to the surviving spouse and next of kin who suffered such pecuniary injury and in proportion thereto. Within 30 days after the entry of such judgment, the judge before whom such case was tried or his successor shall certify to the probate court having jurisdiction of the estate of such deceased person the amount and date of entry thereof, and shall advise the probate court by written opinion as to the amount thereof representing the total pecuniary loss suffered by the surviving spouse and all of the next of kin, and the proportion of such total pecuniary loss suffered by the surviving spouse and each of the next of kin of such deceased person, as shown by the evidence introduced upon the trial of such case. After providing for the payment of the reasonable medical, hospital, funeral and burial expenses for which the estate is liable, the probate court shall determine as provided by law the manner in which the amount representing the total pecuniary loss suffered by the surviving spouse and next of kin shall be distributed, and the proportionate share thereof to be distributed to the surviving

spouse and the next of kin. The remainder of the proceeds of such judgment shall be distributed according to the intestate laws."

It will be noted that the legislature of 1939, while changing some of the language of the statute as previously in force, and permitting recovery for pain and suffering and funeral expenses, did not change the basis for recovery of damages for the benefit of the class that by law would be entitled to inherit the personal property of the deceased had he died intestate. In fact, the language used emphasizes the intention of the legislature to allow damages solely for "pecuniary injury", resulting from the death, on the part of those entitled to participate in any award under the statute. The specific reference to the "pecuniary loss suffered by the surviving spouse and the next of kin" further emphasizes the fact that the legislature obviously did not intend to permit the recovery of damages on behalf of those entitled thereto on any other or different basis than as provided in the death act as originally enacted.

There is no opportunity for dispute as to the interpretation placed by this Court on the provisions of the death act, relating to the recovery of damages for the benefit of those sustaining a pecuniary injury, from the time of the enactment of the original statute in 1848 to and including the present time. In *Chicago & Northwestern R. Co.* v. *Bayfield,* 37 Mich 205 (16 Am Neg Cas 87), Chief Justice COOLEY, writing for the Court, pointed out that the damages recoverable for negligently causing the death of any person were required by the statute to be assessed with reference to the pecuniary injury resulting to those entitled to the damages when recovered. In accord therewith is *Mynning* v. *Detroit, L. & N. R. Co.,* 59 Mich 257, where it was said with reference to the provisions of the death act (p 262):

"It will be noticed that the language of the statute includes only such damages as may be recompensed by pecuniary compensation, not exceeding the statutory amount; and which should be based upon some well-defined facts or known circumstances in the case, —such facts as are susceptible of some proof under the well-settled rules governing the admissibility of testimony. The mental sufferings and injured feelings, or any other injuries which are not susceptible of being compensated by a money consideration to those who are entitled to the benefit of the statute, are therefore necessarily excluded as elements to be taken into consideration by the jury in determining the amount of damages in this class of cases: *Chicago & N. W. R. Co.* v. *Bayfield,* 37 Mich 205 (16 Am Neg Cas 87) ; 2 Rorer on Railroads, pp 860, 1167 ; 2 Thompson, Negligence, p 1289; 2 Sedgwick, Damages, p 537; *Board of Commissioners of Howard County* v. *Legg,* 93 Ind 523 (47 Am Rep 390)."

Of like import is *Hurst* v. *Detroit City Railway,* 84 Mich 539.

The rule of construction recognized in these decisions has been repeatedly followed in later cases, among which may be cited *Beach* v. *City of St. Joseph,* 192 Mich 296, 305 ; *Elliott* v. *Detroit United Railway,* 226 Mich 92, 97 ; *Covell* v. *Colburn,* 308 Mich 240. These decisions and numerous others of like import recognized that the pecuniary loss to be recovered for the benefit of those entitled thereto should be determined in the case of the death of a minor with reference to his prospective earnings until arrival at majority, less the expenses of his care, education, and support.

The construction placed on the death act by this Court from the time of the enactment thereof to the present is in accord with the general rule as recognized throughout the country in States having statutes of like nature to the Michigan act. In jurisdictions confining recovery to the pecuniary loss sus-

tained by the members of a particular class it is generally held that there can be no recovery for solatium or so-called sentimental loss. See annotation 74 ALR 11, 23 *et seq.* Among other decisions in this general field is *Michigan Central R. Co.* v. *Vreeland,* 227 US 59 (33 S Ct 192, 57 L ed 417, Ann Cas 1914C 176). There the action was brought under the Federal employers' liability act to recover damages for the alleged negligent killing of an employee engaged in interstate commerce. Commenting on the nature of the action under the statute it was said, in part (pp 68, 69):

"The obvious purpose of congress was to save a right of action to certain relatives dependent upon an employee wrongfully injured, for the loss and damage resulting to them financially by reason of the wrongful death. Thus, after declaring the liability of the employer to the injured servant, it adds,—'or in case of the death of such employee, to his or her personal representatives, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death,' et cetera. There is no express or implied limitation of the liability to cases in which the death was instantaneous.

"This cause of action is independent of any cause of action which the decedent had, and includes no damages which he might have recovered for his injury if he had survived. It is one beyond that which the decedent had,—one proceeding upon altogether different principles. It is a liability for the loss and damage sustained by relatives dependent upon the decedent. It is therefore a liability for the pecuniary damage resulting to them and for that only.

"The statute in giving an action for the benefit of certain members of the family of the decedent is essentially identical with the first act which ever

provided for a cause of action arising out of the death of a human being, that of 9 and 10 Victoria, known as Lord Campbell's act. This act has been, in its distinguishing features, reenacted in many of the States, and both in the courts of the States and of England has been construed not as operating as a continuance of any right of action which the injured person would have had but for his death, but as a new or independent cause of action for the purpose of compensating certain dependent members of the family for the deprivation, pecuniarily, resulting to them from his wrongful death."

The above decision was cited and followed in *Sipes* v. *Michigan Central R. Co.*, 231 Mich 404, in which the action for damages was brought under the Federal statute. Plaintiff had verdict in the trial court, which was reversed in this Court on the ground that the amount thereof was excessive and not supported by the proofs. It was specifically recognized that the purpose of the statute, which may be regarded as analogous to State death acts, was to permit recovery for the "pecuniary loss" sustained by the widow and child of the decedent in said case.

It must be borne in mind that we are here dealing with a cause of action based wholly on a statute. Without legislative action there could be no recovery. The power of the legislature to prescribe the measure of damages, for whose benefit they may be recovered, and the nature and extent thereof, is not open to question. As has been repeatedly emphasized by this Court, from the original enactment of the death act to the present, we are concerned with the matter of damages for pecuniary loss. The measure of such damages is not the value of the life of the decedent. The legislature has not provided for damages based on any such theory. Obviously human life cannot be evaluated on a pecuniary basis. A human being is not property, and the measure of recovery suggested

by counsel for appellant and which this Court is urged to adopt is at variance with the purpose and theory of the statute as adopted by the legislature. This Court may not amend that statute. We are not invested with legislative powers. If the rule for the determination of damages as prescribed in the statute is to be extended to include items of an intangible nature, in other words to permit a recovery based on injury to feelings, loss of companionship, grief, or other intangible elements that cannot be measured on a pecuniary basis, the legislature alone may bring about such result. The arguments of counsel should be addressed to that body.

We come now to the crux of this case insofar as the present statute is concerned. The legislature of 1939 did not change the purpose or scope of the act except as expressly set forth therein. No provision was made for damages other than for pecuniary loss. The controlling provisions of the prior statute with reference thereto were continued in force and effect, and this the legislature did with knowledge as to the interpretation placed thereon by the courts of the State. *In re-enacting the basic provisions of the act it must be assumed that the legislature intended that such re-enactment should carry with it the interpretation thereof observed from the time of the original statute in 1848.* The rule, well established, is that when a legislative enactment that has been previously construed is adopted by a legislative body such adoption will be regarded as embodying the interpretation so given. Commenting on a situation of this nature, this Court, in *McEvoy* v. *City of Sault Ste. Marie,* 136 Mich 172, 182, 183, said with reference to the interpretation of a statute that in substance re-enacted a prior act:

"When this legislation was enacted, *Joslyn* v. *City of Detroit* [74 Mich 458] had determined the

construction of the act of 1879. If some other State had adopted this legislation, it would be held to have adopted it with that construction. Is it not clear that this same reasoning compels us to say that our legislature, in enacting this legislation, adopted the construction placed upon it in *Joslyn* v. *City of Detroit?*"

Recognizing the principle applied in the above case are *Gwitt* v. *Foss*, 230 Mich 8; *Jeruzal* v. *Wayne County Drain Commissioner*, 350 Mich 527. The recognized rule applicable to the re-enactment of the language of the prior statute leaves no question as to the intent of the legislature of 1939 in the redraft of the death act. Prior decisions of the courts left no question as to the interpretation placed on such provisions, and the language of the revised enactment is in accord therewith. The will of the legislature as expressed in the act of 1939 is controlling in the case at bar. That it was intended to prescribe the measure of damages in cases brought under the statute is clearly indicated by the language of the amended title. The declaration there set forth is significant, and the conclusion may not be avoided that the measure of damages so prescribed was that established by court decisions in previous cases construing the death act.

In the instant case the circuit judge submitted the case to the jury in accordance with such legislative intent, setting forth the nature of the damages that might be recovered in the action if the jury found in favor of the plaintiff, and specifying also the method for determining damages for pecuniary loss on the part of decedent's father. The charge as given was correct. However, it appears from the verdict returned that the jury did not follow the instructions. Our examination of the testimony in the case brings us to the conclusion, in accord with that of the trial

judge, that the proofs failed to justify the size of the verdict.

In granting the motion for a new trial unless plaintiff consented to a remittitur the circuit judge said in the opinion filed by him:

"The jury knew and understood that it was. dealing with the rule of damages .as specified in the statute and interpreted by the courts, *viz:* (1) Expenses of decedent's funeral and burial; and (2) the present value of decedent's earnings, if any, during the remainder of his minority, less the present value of the cost of his support during the same period, in such amount as found by the jury to be fair and just under the proofs submitted.

"There is no question involved in the amount of the funeral and burial expenses, undisputed in the sum of $979.90. This leaves $14,000 as the amount the jury found in damages under the second above-stated rule. This court does not hesitate to say that it believes this amount to be excessive under the rule. It can conclude only that the jury was influenced by sympathy surely, or possibly also by some other motive in obtaining such result.

"The writer of this opinion, based on his own experience and observation covering a period of upwards of 60 years, during which the purchasing power of money has progressively decreased, cannot bring himself to believe that any boy of the age of decedent, with all of the excellent personal qualities and traits of character that decedent is shown by the testimony to have possessed, and which are conceded, but with no special skills or qualifications for obtaining earnings above average in the community in which he lived, and with his background, could have had the earning capacity indicated by this verdict, even under modern conditions.

"Believing that damages in this case should be substantial, particularly on the basis of the proofs submitted, the court feels bound by what the proofs justify, rather than by what this jury has awarded,

and feels itself in duty bound to correct the verdict.

"Accordingly, an order may be entered granting defendants' motion for a new trial unless plaintiff shall within 15 days remit all of the amount of the verdict rendered herein in excess of $8,479.90."

We think the finding of the judge as indicated by the above language was fully justified. It appears from the transcript of the testimony filed as part of the original return to this Court that he followed the proofs carefully, having in mind the issues in the case and the proneness to sympathy on the part of a jury in an action of this nature. The supreme court of California in *Bond* v. *United Railroads of San Francisco,* 159 Cal 270 (113 P 366, 48 LRA NS 687, Ann Cas 1912C 50), cited by Mr. Justice SMITH in his opinion, in construing a State statute allowing the recovery of damages for death resulting from wrongful act or neglect, which statute differed materially from the Michigan act, took occasion to comment on the claim that under the rule recognized by the California court excessive verdicts might be rendered, and the duty of the trial judge in such cases, saying in part (pp 285, 286):

"With regard to the danger of excessive verdicts from this rule, we can only say, that the remedy is practically committed entirely to the judge who presides at the trial in the court below. If he does his duty he will carefully weigh the evidence himself and will not allow a verdict to stand for its full amount if he believes it gives more damages than the pecuniary loss that it may be reasonably supposed the plaintiff will actually suffer by being deprived of the services, earnings, society, comfort, and protection of the child. The rule that allowance may be made for pecuniary loss from deprivation of society, comfort, and protection of a son is apparently settled and cannot now be disturbed. It is evident to us, however, from the cases that have come before us,

that it often leads to extravagant verdicts in which the jury, in fact, allow a supposed compensation for sad emotions and injured feelings, instead of confining their verdict to the actual pecuniary loss. While it cannot be said that comfort, society, and protection is never of any pecuniary benefit either in saving or gaining money or property, it must be admitted that the connection can seldom be traced from one to the other. Juries should be insistently cautioned not to allow compensation for the sorrow and distress which always ensues from such a death, nor for a pecuniary loss which is remote or conjectural in the particular case. The trial court should be vigilant to set aside verdicts where there is reason to believe this has been done, or that passion, prejudice, or sympathy has influenced the jury to give more than the facts reasonably warrant. We have cause to fear that the trial courts sometimes act on the theory that they can shift the responsibility in this matter to the appellate court, and that an excessive verdict can be corrected on appeal. This is a mistake. Our power over excessive damages exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush, passion, prejudice, or corruption on the part of the jury. (See *Hale* v. *San Bernardino Valley Traction Co.*, 156 Cal 713, 716 [106 P 83]; *Wheaton* v. *North Beach & M. R. Co.*, 36 Cal 590, 591.) Practically, the trial court must bear the whole responsibility in every case."

We think it may fairly be said that the trial judge recognized the responsibility resting on him in the trial of the instant case and that his action in granting a new trial in the event of a refusal on the part of the plaintiff to consent to the remittitur was based on his familiarity with the proofs and the applicable principles of law in litigation of this nature. Generally speaking, the granting of a new trial rests largely in the judicial discretion of the trial court.

*Deffenbaugh* v. *Inter-State Motor Freight Corporation,* 254 Mich 180, 183; *Van Lierop* v. *Chesapeake & Ohio R. Co.,* 335 Mich 702; *Murchie* v. *Standard Oil Company,* 355 Mich 550.

Under the record in the instant case it may not be said that there was any abuse of discretion on the part of the trial judge in entering the order from which plaintiff has appealed. Such an order is not unusual in connection with motions for new trials in personal injury cases. In *Cabana* v. *City of Hart,* 327 Mich 287 (19 ALR2d 333), plaintiff's decedent, who was 16 years of age at the time, came to his death by coming in contact with a lamp post that was charged with electricity. The action was brought on the theory that defendant municipality was guilty of negligence in the maintenance of the post, and consequently was liable under the provisions of the death act. The case was submitted to the jury which returned a verdict in the sum of $7,483.63. On motion for a new trial an order was entered granting the motion unless plaintiff consented to a reduction to the sum of $5,000. That was done, and the verdict for the latter sum was sustained by this Court, it being found that it was supported by the proofs.

Under the proofs in the case at bar we think that the trial judge acted properly and that his conclusion that the evidence did not support the verdict returned by the jury was well-founded. There was no abuse of discretion on his part, and the order from which the appeal has been taken should be affirmed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.