Daniel G. Albert, J.
This is a wrongful death action brought by a mother, Barbara Gary, on behalf of her 16-year-old son, Robert, who suffered fatal injuries on the evening of October 27,1969 when the bicycle on which he was riding was struck by the motor vehicle being driven by the defendant’s 20-year-old son, David Schwartz. After a four-day trial the jury returned a verdict for the plaintiff in the amount of $100,510.40, cqmprised of special damages of $2,510.40 and general damages of $98,000.
The following morning both counsel appeared in the court’s chambers and defendant’s attorney presented his post-trial motion to set aside the verdict pursuant to article 44 of the *333 CPLR on the grounds that the verdict was contrary to the weight of the evidence insofar as liability was concerned and that it was excessive insofar as the amount of damages was concerned. The motion is denied in all respects.
Regarding liability, the jury’s verdict is clearly not against the weight of the evidence. On the contrary, it is entirely supported thereby. Decisional and textual authorities agree that “ jury verdicts should not be set aside merely because the trial judge would have decided differently, but only in cases where the verdict seems palpably wrong and it can be plainly seen that the preponderance is so great that the jury could not have reached their conclusion upon any fair interpretation of the evidence.’” (4 Weinstein-Kom-Miller, N. Y. Civ. Prae., par. 4404.09; Marton v. McCasland, 16 A D 2d 781, 782; Weeks v. Beardsley, 33 A D 2d 607). In this case the Trial Judge would not have decided the issue of liability differently, and the jury was presented with factual questions which could fairly have been and in fact were resolved in plaintiff’s favor. The jury’s conclusion can in no way be termed “ palpably wrong,” and it is supported by a fair interpretation of the evidence, which I shall now summarize.
It was established that on the evening in question, October 27, 1969 at 7:30 p.m., night had fallen. It was dark, the street lights were on, the intersection where the accident occurred was well lighted, visibility was good and defendant’s headlights were on. (While the sole defendant is actually the owner of the vehicle and mother of the operator thereof, the term defendant shall be used for convenience to refer to the driver, since the owner’s liability is based upon the conduct of the operator.) The decedent, Robert Gary, two months short of his 17th birthday, had been working on a term paper at his home which was located two houses in on Third Street just south of Waukena Avenue in Oceanside, Nassau County, the intersection where the fatal accident occurred. A senior in the local public high school, Robert left his house to go approximately three blocks to a candy store in order to purchase a stamp so that he could mail a college application that evening, and he rode his 14-year-old brother’s bright orange small-wheeled bike which had a reflector and was covered with iridescent stickers, but which bore no light. As he returned home in a southerly direction along Third Street at about 7:30 p.m. and crossed Waukena Avenue, less than 50 yards from his house, his bike was struck by the motor vehicle driven westbound by the defendant. The decedent’s mother, in the bathroom of her home, heard a crash which “ shook the *334 house, ’ ’ and when she rushed out along with her neighbors to discover what had happened she found her son lying on the northerly side of Waukena Avenue about three fourths of the way down to Fourth Street.
The defendant testified that he did not see the decedent on his bicycle until he was past the curb line on Third Street, already out on Waukena Avenue. Upon seeing the bike, the defendant, who was allegedly traveling within the speed limit of 30 m.p.h., swerved to his left, hit his brakes as hard as he could and admittedly spun out of control. His vehicle then traveled some 150 feet, crossed Waukena Avenue, spun around so that it was now facing eastbound, and jumped the southerly curb, drove up onto the front lawn of the second house west of the intersection, knocked down a large 15-foot pine tree with a trunk diameter of seven inches and came to rest close to the house itself. The path of the uncontrolled auto was accurately traced by its tire marks on both the road and the lawn and by the destruction left in its wake, attested to by photographs and eyewitness testimony. The force of defendant’s braking and swerving caused his sister, riding in the front seat as a passenger, to hit ■her head on the windshield, which was cracked when the car was finally halted.
In charging the jury, I briefly summarized the respective contentions of the parties as follows:
“ The plaintiff claims that David Schwartz was speeding and driving recklessly, that he failed to see the decedent on his bike, that he failed to exercise due care in approaching the intersection of Waukena Avenue and Third Street in Oceanside, Nassau County, where the accident occurred, and that defendant’s negligence caused the fatal injuries suffered by the decedent, Robert Gary.
“ Defendant Ethel Schwartz, on the other hand, contends that David Schwartz was not negligent so as to cause the accident complained of, that he was driving 30 miles per hour within the speed limit, and that the decedent himself was guilty of contributory negligence, which contributed to the happening of the accident in question, by riding his bike out onto Waukena Avenue without coming to a full stop as required by the stop sign on the right corner of Third Street.”
In addition, I quoted to the jury the pertinent portions of various. provisions of the New York Vehicle and Traffic Law, viz., section 1180 (subds. [a] and [d]) (speed restrictions); section 1231 (applicability of the Vehicle and Traffic Law provisions to persons on bicycles); section 1236 (subd. [a]) (lamp *335 requirement for bicycles after dark); and sections 1172 (subd. [a]) and 1142 (subd. [a]) (stop sign requirements). No objections or exceptions were interposed by either party to this or any other portion of the court’s charge.
While the plaintiff was not entitled to judgment as a matter of law, it was clearly within the province of the jury to conclude from the evidence presented that the defendant was negligent in the operation of his motor vehicle because he was speeding or driving recklessly or carelessly and failed to observe the decedent in sufficient time to avoid the accident, and similarly it could reasonably have concluded that the decedent used that measure of due care, to be expected from a 16-year-old lad and that he did not fail to stop for the stop sign on Third Street at the corner of Waukena Avenue. In fact, there was no evidence whatever to show that the decedent had not stopped for the stop sign, and there was ample physical evidence that the defendant had been driving far in excess of the authorized speed (30m.p.h.).
Under these circumstances, this court will not and indeed should not interfere with plaintiff’s right to a jury verdict which, in my opinion, was eminently fair and proper in this case insofar as liability is concerned. (See Serrano v. Corcoran Plate Glass Co., 40 A D 2d 53; Braun v. Consolidated Edison Co. of N. Y., 31 A D 2d 165, 171-172, affd. 26. N Y 2d 825; Carino v. Marino, 28 A D 2d 514; Smith v. McIntyre, 20 A D 2d 711.)
Turning now to the second and far more troublesome branch of defendant’s motion, i.e., to set the verdict for $100,510.40 aside as excessive, I am confronted with a state of the law which would appear to impose á simple accounting formula for ascertaining the pecuniary loss to a parent whose child has been wrongfully killed: probable wages of the child less cost of upkeep until the infant would have reached 21 years, a formula which “would almost always result in a minus figure.” (Hoyt v. United States, 286 F. 2d 356, 361.) A perfunctory application of such a formula results in the irresistible conclusion that the verdict in this case is excessive in its entirety, and such a conclusion causes me to pause and reflect upon the circumstances of this case and the redress which should be available to a person such as the plaintiff herein, a widowed mother whose older son was tragically killed as a result of the defendant’s negligence.
The decedent Eobert Gary was not a 16-month-old baby whose character, personality, intellect and potential would be undefined and incalculable. On the contrary, he was a 16-year-old student, a highly intelligent, industrious and talented individual, *336 a senior in high school, headed for premedical college and a dental career thereafter. He was short in height, his health was excellent, he participated in wrestling activities in school and loved all sports. According to the testimony adduced at the trial, he had passed his driver education course in high school and, had he lived, would have received his driver’s license but two months after the fatal bicycle accident. He was a quiet, conservative lad who neither drank nor smoked, who dressed neatly, obeyed his parents, went to summer school to obtain better grades (although he had never failed any of his courses) and who did odd jobs in local shops and neighbors’ homes since he was 13 years old in order to raise pin money with which he bought gifts for the family (a toaster, for example, as well as pearl earrings for mother, bathrobe for father), depositing the balance of any such moneys in the bank for college and other expenses. Robert was cautious when using tools; he did minor repair work and performed gardening tasks for his own family as well as for neighbors. One such neighbor, in fact, testified that Robert G-ary did the gardening work around her home twice a week, that he worked hard and did a beautiful job, that he was a fine boy and that she [1] ‘ would have been proud to have had him as her grandson.” Similarly, one of Robert’s teachers who had known the boy for over five years testified that he would have been proud to have had Robert “as a son.”
Thus we have a fairly accurate portrait of this 16-year-old youth, just two months shy of his 17th birthday, a high school senior preparing for college and a probable career in dentistry. He is now dead, and the jury is given the most difficult burden of determining the pecuniary loss to his mother and his younger brother on account of such death.[1]
It is well known that a cause of action for wrongful death did not exist at common law, and perceiving the terrible inequities in such a state of the law our legislative bodies remedied the situation by enacting so-called wrongful death statutes, starting with Parliament in 1846 (Lord Campbell’s Act) and culminating in this State with the adoption of part 4 of article 5 of EPTL in 1967.
Section 5-4.1 reads in pertinent part: “ The personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent’s death against a 'person who would *337 have been liable .to the decedent by reason of snch wrongful conduct if death had not ensued.”
The amount which may be recovered in such an action is prescribed in section 5-4.3, which reads as follows: ‘ ‘ The damages awarded to the plaintiff may be such sum as the jury or, where issues of fact are tried without a jury, the court or referee deems to be fair and just compensation for the pecuniary injuries resulting from the decedent’s death to the persons for whose benefit the action is brought. In every such action, in addition to any other lawful element of recoverable damages, the reasonable expenses of medical aid, nursing and attention incident to the injury causing death and the reasonable funeral expenses of the decedent paid by .the distributees, or for the payment of which any distributee is responsible, shall also be proper elements of damage. Interest upon the principal sum recovered by the plaintiff from the date of the decedent’s death shall be added to and be a part of the total sum awarded. ’ ’
How is one to determine the “ pecuniary ” loss to a widow on the death of her 16-year-old son! According to our decisional authorities, the standard to be used is as follows: ‘ The jury, in determining the amount of damages that should be awarded, was in duty bound to consider the various elements of pecuniary loss sustained by the father. First, the probable earnings of the son during his minority over and above his support, clothing and education; next, the probability of his living and becoming of sufficient ability to support his father in case of his becoming aged, poor and unable to support himself; and then they had-the right to consider the amount he would have brought to his next of kin while living and their prospect of inheriting from him after death. (Johnson v. Long Is. R. R. Co., 80 Hun, 306; affirmed in this court, 144 N. Y. 719.) ” (Keenan v. Brooklyn City R. R. Co., 145 N. Y. 348, 350-351; see, also, Ihl v. Forty Second St. & Grand St. Ferry R. R. Co., 47 N. Y. 317, 321.)
It is an exercise in futility to attempt to realistically apply such a standard .today, and if this formula is no longer relevant and applicable to our contemporary social structure and mores, it should be discarded in favor of a standard which would enable a just award in damages to be rendered where the wrongful death of an infant is concerned.
The historical development of the child-labor standard of pecuniary loss (wages less cost of upkeep) and the bases therefor are fully and accurately described in Fornaro v. Jill Bros. (42 Misc 2d 1031, revd. on other grounds 22 A D 2d 695, affd. 15 N Y 2d 819), and need not be repeated at length herein. *338 Suffice it to say that it was formulated in an era when child labor was exploited — “ one of the darkest chapters in the history of childhood ’ ’— and for that very reason the infant earned a paltry wage which was measurable, enabling ‘ pecuniary loss ” to be ascertained upon the subtraction of the cost of upkeep and education from the wages earned. What a callous approach to the valuation of a human life! Since the appalling child-labor conditions have long since been eradicated, how can a formula based upon such a condition remain applicable ? As the Michigan Supreme Court stated in the landmark case of Wycko v. Gnodtke (361 Mich. 331), while overruling the child-labor measure of pecuniary loss to a parent: “ Loss meant only money loss, and money loss from the death of a child meant only his lost wages. All else was imaginary. The only reality was the King’s shilling. That this barbarous concept of the pecuniary loss to a parent from the death of his child should control our decisions today is a reproach to justice.” (p. 337).
And would any other conclusion spell justice? The cases relied upon by defendant on this motion illustrate the callousness of the present rule and the apparent axiomatic intrusion by the courts into the province of the jury insofar as the assessment of damages for wrongful death is concerned. In Alfieri v. Cabot Corp. (17 A D 2d 455, affd. 13 N Y 2d 1027) the 27-year-old unmarried decedent had been asphyxiated by the fumes from some improperly labeled charcoal, and his father recovered a jury verdict for the wrongful death of his son in the amount of $180,000. Upon a post-trial motion to set the verdict aside as excessive, the trial court ordered a new trial unless the plaintiff stipulated to accept $90,000. Plaintiff so stipulated, but the defendants nevertheless appealed. Without explanation the majority of the Appellate Division reduced the award to $30,000 and the dissenting Justice would have reduced the father’s damages to zero: “ The deceased and his father worked for the same concern and the father earned in excess of $10,000 a year, the s'on about $5,300. It is claimed that he contributed $2,600 a year to his pareiits. Aside from the fact that this was not a contribution but paid partially for his board and lodging, is it to be contemplated that this young man would never marry and that he would devote his earnings to the support of his parents who made twice what he himself earned? To realize $30,000 it would be required that he contribute his entire earnings for a period of five and a half years without retaining for himself, or his parents spending for him, a single cent for food, lodging, clothing or anything else. Moreover, *339 this is on the assumption that nothing was to he ueducted from his earnings for taxes. When these are considered, the utter impossibility that .this figure represents an evaluation of his future contributions becomes manifest.” (p. 465; italics supplied).
Earnings, food, lodging, clothing, even taxes! Are these the criteria by which we must ascertain the loss in terms of dol1 ar,s to a decedent’s next of kin ? Are we to have a tax accountant establish the decedent’s allowable tax deductions and credits before the damages for the infant’s wrongful death can be ascertained? I cannot embrace such a bookkeeping approach in arriving at the value of the life of such a lad as Robert Gary.
I note, moreover, that the decedent in the Alfieri case {supra) was not an infant, was not obliged to support his parents (who were “ financially independent ”), and the plaintiff therein was not a widow who would naturally have looked to her older son for financial and moral support. Accordingly, even if the bookkeeping formula tacitly acknowledged in that case would be reiterated by our appellate courts in a similar situation today, the present case is distinguishable on the facts and not controlled thereby.
In Lawler v. Nucastle Motors Leasing (35 A D 2d 450), the jury awarded the mother, a remarried divorcee, the sum of $55,000 for the wrongful death of her 23-year-old daughter, killed when thrown from her car after a collision. The Appellate Division reduced the award to the same amount as allowed in the Alfieri case — $30,000. While one of the avowed purposes of judicial review of jury awards is to reduce or eliminate the element of speculation therefrom (Thl v. Forty Second St. & Grand St. Ferry R. R. Go., 47 N. Y. 317, 321, supra), what could be more speculative than having the jury consider that the decedent would probably have married in 11 years rather than in 21 years? Such was the apparent reasoning and conclusion of the court in the Lawler decision: ‘ ‘ There is nothing in this record to suggest that the decedent had any legal obligation to support her mother. By awarding the plaintiff $55,000- the jury impliedly determined that the decedent’s voluntary contributions of $2,600 per annum [$50 a week] to the household would have continued for approximately 21 years beyond the date of the decedent’s death at which time this 23-year-old girl would have been 44 years old. In my view it would have been proper for the jury to consider that in the normal course of events the decedent would have long since been married and contributing to her own family (see Breckir v. Lewis, 21 A D 2d *340 546). I find the verdict excessive under the circumstances here present and conclude that the sum of $30,000 represents a more reasonable estimate of the extent of the plaintiff’s financial deprivation by reason of her daughter’s wrongful death.” (35 A D 2d at 453.) Again, as in Alfieri, the decedent was not an infant, was not supporting a widowed mother, and was not needed to aid and counsel a younger, fatherless brother. I am constrained to distinguish the Lawler case from the present one and do not find it dispositive of the issue presented here.
Why is it that the Federal courts in this State, interpreting the same statute and implementing the same rules of law presented in this and the cases cited above, have let stand verdicts significantly greater than those allowed by our State courts? The Federal decisions have repeatedly construed the applicable New York State wrongful death statute as controlling, and have regularly cited and applied the pecuniary damage rule. (See Campbell v. Westmoreland Farm, 270 F. Supp. 188, app. dsmd. 403 F. 2d 939; see, also, Jones v. United States, 304 F. Supp. 94, affd. 421 F. 2d 835.) Nevertheless, the Second Circuit Court of Appeals recently upheld a jury verdict of $252,000 for the wrongful death of an 18-year-old boy whose sole surviving next of kin was a mother who had been previously abandoned by her husband, a strikingly similar situation to the one presented at bar. (Hart v. Forchelli, 445 F. 2d 1018, cert. den. 404 U. S. 940.) The boy was a freshman at college, an honor student with plans to become an attorney, a son who had voiced his intention to support his mother when he had completed his education. The Court of Appeals reviewed the standard to be applied in its review of the jury’s award, and used terms not unlike those employed by our State courts when performing a similar function: ‘ ‘ The standard we are to apply is hardly a precise one. As the Supreme Court noted in a footnote in its opinion in Grunenthal v. Long Island R. R. Co., 393 U. S. 156, 159, 89 S. Ct. 331, 333, 21 L. Ed. 2d 309 (1969): ‘ The standard has been variously phrased: “ Common phrases are such as: grossly excessive, ’ ‘ inordinate, ’ ‘ shocking to the judicial conscience, ’ ‘ outrageously excessive, ’ ‘ so large as to shock the conscience of the court, ’ ‘ monstrous, ’ and many others. ” ’ ” (445 F. 2d at 1019). The court’s final sentence was simply stated: “We are nevertheless [despite the size of the verdict] unable to conclude that the amount is so unreasonable as to justify this court’s intervention.” (Id. at 1020; see, also, Campbell v. Westmoreland Farm, E. D. N. Y. Apr. 27, 1972.)
*341 The verdict in that case was $252,000; in this case — $100,500. What standard did the jury apply in this case to reach its conclusion that plaintiff Barbara Gary should receive $2,510.40 in special damages and $98,000 in general damages for the wrongful death of her 16-year-old son Robert? The court’s instructions to the jury on the law of damages in this case, culled from the applicable statutory and decisional law, as well as the relevant Pattern Jury Instruction and the comments thereto (PJI 2:320), read as follows, without exception by either party:
“ In the event, after applying the rules of law applicable to this case as I have charged, you find for the plaintiff Barbara Gary on her claim herein, then, in determining the damages sustained by the plaintiff you must apply the following rules of law.
“ The assessment of damages is an important part of your duties. It must be done with justice to both sides. An injury is not to be used as a basis for profit. You may award compensation only for damages actually sustained. It must not be based upon sympathy or prejudice nor upon speculation or conjecture. You will make such an award as you think just and proper to fairly compensate the plaintiff-administratrix, Barbara Gary, as far as money can do, for the pecuniary loss she has suffered or may suffer in the future as a result of the death of her son, the decedent Robert Gary.
“With respect to plaintiff’s cause of action the measure of damages is fixed by statute at ‘ such a sum as the jury * * •* deems to be a fair and just compensation for the pecuniary injuries, resulting from the decedent’s death, to the person or persons, for whose benefit the action is brought. ’ The present action is brought on behalf of decedent’s mother, since his father died in July, 1972. Since the statute limits recovery to pecuniary injury, you may not consider or make any award for sorrow, mental anguish or injury to feeling or loss of companionship. You must appraise in an impartial manner to the best of your ability the pecuniary or money value of decedent to his mother and to his brother.
‘ ‘ In fixing that value you should take into consideration decedent’s character, habits and ability; the circumstances and condition of his widowed mother, the services he would have performed for his mother had he lived; the portion of any earnings that he would in the future have applied to the care and support of his mother; decedent’s age and life expectancy and the age and life expectancy of his mother.
The evidence is that decedent was, at the time of his death
16 years of age and, according to the mortality tables, had a *342 life expectancy of 53.24 years, and that his mother was then 38 years of age and had a life expectancy of 37.48 years. Mortality or life expectancy tables are, of course, nothing more than statistical averages.' They neither assure the life spans that I have given nor assure that decedent’s life span might not have been or that his mother’s will not be greater. The figures I have given you are not binding upon you but may be considered by you together with the evidence you have heard concerning the health, habits, employment and activities of decedent prior to his death and of his mother in determining what their respective life expectancies were at the time he died.
“ As I have stated, it is the pecuniary value of decedent to his niother that you must fix. That value is incapable of exact proof since it is prospective and contingent. Considering all of the elements to which I have referred, you must exercise your own common sense and sound judgment in fixing the amount of the pecuniary injuries suffered by decedent’s mother. To the sum thus determined, you will add the reasonable expenses for medical aid, nursing and attention incident to the injury causing death, and for the funeral of and a burial lot for decedent, which were testified to as being $2,510.40. The total thus ascertained by you will constitute your verdict, if you find for the plaintiff.
‘ ‘ Where the decedent is a child, the pecuniary loss of the parent is measured by the services of the child during minority less the cost of his maintenance and education during that period, and in addition all the probable, or even possible, pecuniary benefits which might result to the parent from his life, modified as you the members of the jury find by all the chances of failure and misfortune. In considering benefits likely to result to the decedent’s parent after the decedent had reached the age of 21 years, you must realize that the parent has no legal claim on the earnings of her adult child unless she becomes unable to support herself. The plaintiff’s loss also includes the probability that she would benefit from earnings the child might have accumulated. ’ ’
Who can say that a jury could not reasonably have awarded a verdict of $100,510 in light of the evidence adduced at the trial and court’s charge on the law? If the verdict had been for $5,000 I would consider it palpably inadequate, totally unsupported by any fair interpretation of the evidence, and would set it aside without fearing that I had unreasonably encroached upon the province of the jury to make such an award. I would feel similarly if the verdict had been for $5,000,000. But where in between does a jurist draw the line? Perhaps one can reason *343 ably argue that there are other amounts in between which if awarded would warrant judicial interference, but I do not consider an award of $100,000 to be included in such unconscionable ” sums. On the contrary, I feel the jury in this case was eminently justified in granting this widow a pecuniary award of $100,000 for the wrongful death of her 16-year-old son who in all likelihood, based upon the evidence adduced at trial, would have faithfully borne the burden of caring for his mother and in aiding his younger brother, if necessary, upon the completion of bis education.[2] '
How long must we wait for the Legislature to act to overthrow the barbaric theory that a defendant who has wrongfully and. negligently killed a child in effect bestows a benefit upon the parents by relieving them of their obligation to feed, clothe and educate such child? The net pecuniary loss to the parents “would almost always result in a minus figure ” as noted above, a result which the Legislature could not have contemplated and a possibilty which the courts should no longer countenance. The harshness of a rule requiring such deductions was forcefully exposed in Hoyt v. United States (286 F. 2d 356, 362, supra), where the court stated: “we cannot believe that Congress intended to allow any such coldblooded deduction. Such a deduction is not actually logical for it would treat an incalculable loss as a ‘ pecuniary gain. ’ What makes life worth living more than the privilege of rearing a son? Shall that privilege be treated by the law as a liability of which the child’s death relieves the parent? Is it not still the law in that most sacred of relationships that it is more blessed to give than to receive? We are entirely without doubt that Congress intended no deduction to be made for the cost of rearing the child to majority.”
/ How absurdly fortunate is the defendant whose infant victim mas died rather than simply having suffered serious injuries capable of monetary evaluation! In an attempt to combat such an anomalous situation Mr. Justice Schwartzwald, almost nine years ago in the Homaro case (42 Misc 2d 1031, supra), beseeched our Legislature to rectify the manifestly inequitable child-labor net-loss principle which he felt constrained to apply: “ It is the *344 hope of the court that this decision will alert our State legislators and our law revision agencies to the inadequacy of the statute so that they may again blaze the trail in liberal and advanced legislation as they did in yesteryear, thereby providing a proper remedy through the enactment of a fair and just measure of damages in the case of the wrongful death of an infant. ’ ’ (42 Mise 2d 1031,1037).
Since that eloquent challenge has gone unheeded, I feel strongly that judicial, action is required so that it may not be said that we, too, failed where everyone else had failed. Human life may be the cheapest commodity in some areas of the world today, to our great dismay and remorse, but this only reinforces my belief that the time is now for us to act so as to conform our judicial theories in the area of wrongful death, as well as elsewhere, with our fundamental Judaeo-Christian belief in the sanctity of human life and our legal, ethical and philosophical commitment to that precept. The commitment is no less, simply because the decedent is not an adult, nor a breadwinner, nor a parent. The intrinsic value of a human life is still present, and in the proper context of a fair charge on the law, without resort to maudlin emotion, we should wherever possible leave the monetary valuation of such a destroyed life to the ever human logic and reasoning of a jury of one’s peers.
Such valuation cannot and should not be subject to a hard and fast “bookeeping” formula such as the “wages less cost of upkeep ” principle, and the Michigan Supreme Court in the Wycko ease (361 Mich. 331, 338-340, supra) attempted to lay the foundation for a proper and more humane valuation which perhaps we should adopt in cases such as these: *345 a value to others as part of a functioning social and economic unit. This value is the value of mutual society and protection, in a word, companionship. The human companionship thus afforded has a * * * value and its loss forms a part of the * value ’ of the life we seek to ascertain.”
*344 “What, then, is the pecuniary loss suffered because of the taking of-the child’s life? It is the pecuniary value of the life. We are aware, of course, that there are those who say that the life of a human being is impossible to value, that although we will grapple mightily with the value of the life of a horse, of a team of mules, we will stand aloof where a human is concerned and assign it no value whatever * * * In the cases coming to us a life has been taken and it is our duty, as best we can, to put a fair valuation on it. In so doing, we will keep in mind that the act is remedial in its character and our duty is to construe it liberally in favor of the beneficiaries.
[1] ‘ The pecuniary value of a human life is a compound of many elements * * * we must consider the expenses of birth, of food, of clothing, of medicines, of instruction, of nurture <md .shelter, * * * an individual member of a family has
*345 The time has come for us to eradicate the barbarous condition in our law which has prompted the argumentative but nonetheless sadly applicable query raised by the American Trial Lawyers Association: “ How much is a worthless child worth?” (See 15 ATL News L. 255-226 [Aug., 1972]; 15 ATL News L. 226 [June, 1972]; 14 ATL News L. 395 [Nov., 1971]; and 32 ATLA L. J. 628-636 [1968].) In a similar vein, how much more is the life of a child worth in the Federal courts of this State, than in the State courts sitting sometimes directly across the street? According to the theory of the Wycko decision {supra), we should not be hesitant to place a fair and honest value upon a human life when we will struggle arduously to appraise a team of oxen, a television set, or a parcel of real estate. I must concur with the compassionate reasoning of the author who bids us to embrace the rationale of the Wycko case “because, assuming it to be a legitimate function of the law, we are all ennobled and enriched in direct proportion to the extent to which the law regards a human life as something greater than a profit-producing chattel.” (Glasser, “ Torts & Workmen’s Compensation ”, 16 Syracuse L. Rev. 373, 386).
For all of these reasons, defendant’s motion to set the verdict herein aside as being contrary to the weight of the credible evidence and excessive is denied in all respects.

. At the time of Robert’s death his mother was working as a teacher’s aide, earning approximately $4,000 per year,

. Evidence as to the widowed status of decedent’s mother, whose husband died from a heart attack but four months prior to trial, was introduced without objection, but fairness and compassion, which have not yet been eradicated from our judicial precepts, would have dictated the admissibility of such evidence in any event, since it reduces in great part the degree of speculation in which the jury was required to indulge.